[No. S010685. Dec. 22, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN EDWARD CRITTENDEN, Defendant and Appellant.

**COUNSEL**

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, Albert W. Brodie and Ellen J. Eggers, Deputy State Public Defenders, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Edmund D. McMurray and Jesse Witt, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GEORGE, J.**—Following the guilt and special circumstance phase of a capital trial, a jury found defendant Steven Edward Crittenden guilty of the first degree murders and the robbery of Katherine and William Chiapella

(Pen. Code, §§ 187, 189, 211, 212.5).[1] As to both murders, the jury found that defendant personally used a deadly weapon (§ 12022, subd. (b)), and found true the special circumstance allegation that defendant committed the murders in the course of a robbery (§ 190.2, subd. (a)(17)(i)). With respect to the murder of Katherine, the jury found true the additional special circumstance allegation that defendant committed multiple murder (§ 190.2, subd. (a)(3)), and with respect to the murder of William, the jury found true the additional special circumstance allegation that the murder involved the infliction of torture (§ 190.2, subd. (a)(18)). The jury also found defendant guilty of the additional offenses of escape from jail with force or violence (§ 4532, subd. (b)), and the kidnapping of Douglas Kronen (§ 207, subd. (a)).

Following the penalty phase of the trial, the jury imposed the death penalty. After denying defendant's motion for modification of the verdict imposing the death penalty, and imposing sentences on the other convictions, the court sentenced defendant to death for the murders of Katherine and William Chiapella. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

FACTS

The evidence at trial (held in Placer County following defendant's successful motion for change of venue from Butte County, in which the City of Chico is located) established that on January 13, 1987, defendant entered the Chico residence of William and Katherine Chiapella and, by threatening Katherine, forced her to write a personal check payable to defendant in the amount of $3,000. Defendant tied up both William and Katherine and then proceeded to kill both of them. Defendant subsequently was arrested and confined in jail. On May 11, 1987, defendant escaped from jail and confronted Douglas Kronen inside Kronen's residence. Defendant forced Kronen at gunpoint to drive defendant to Sacramento, where defendant was apprehended.

I. *Guilt Phase Evidence*

A. *The prosecution's case*

1. *The Chiapella crimes*

In 1986, Dr. William Chiapella (hereinafter, William), 68 years of age and suffering impaired locomotion from disease, and his wife, Katherine Chiapella (hereinafter, Katherine), 67 years of age, lived at 1416 Downing

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Avenue in Chico. On October 9, 1986, Katherine submitted a job order form at the Employment Development Department at California State University, Chico, seeking to employ a student to perform yard work at the rate of $4.50 per hour. On the following day, Katherine hired defendant, who then was enrolled as a student at that institution, but Employment Development Department records indicate he failed to appear for work. In the middle of that month, defendant mentioned the job to his girlfriend, Diana.

In mid-December 1986, Julie Gearing sublet her apartment to defendant. Early in January 1987, defendant's landlord telephoned defendant to discuss defendant's rent payment, because the landlord had been unable to cash defendant's check due to insufficient funds. On January 11, defendant contacted his landlord in order to reschedule their meeting from January 12 to January 14, advising him that defendant would "pay it all" at that time. Meanwhile, on January 6, 1987, William had submitted a job-order form at the Employment Development Department, seeking someone to perform yard work at the rate of $5 per hour.

Edith Bullard, the Chiapellas' housekeeper, last saw the couple when she cleaned their residence on January 12, 1987. At the time, she observed that the desk in the study was neat and there was no accumulated mail. She recalled five days earlier having cleaned a plastic floor runner under the desk. On the morning of January 13, Ms. Bullard telephoned the Chiapellas, informing Katherine she had the flu.

That same day, John Eyrich, defendant's roommate, noticed that a knife he owned (used by his father years earlier in the meat packing business to drain blood from animal carcasses) was missing. Defendant informed Eyrich that defendant was using it to repair his stereo and would return it the following day.

On the morning of January 13, Dr. Joseph Chiapella, William and Katherine's son, spoke with his mother by telephone. That morning, William telephoned Janet Steunkel, a family friend, to wish her a good trip. When Steunkel informed him she was not leaving on the trip until January 16, William advised he would telephone again on January 14 or 15, but never did so. Shortly after 1 p.m. on January 13, Katherine brought a pair of slacks to a local dry cleaners, requesting that they be cleaned by the following day, but she never returned to collect them. At 3 p.m. on January 13, the Chiapellas met with their attorney, Robert Laughlin, for less than 30 minutes. The Chiapellas informed him they planned to travel to San Francisco the following day to attend the theater and visit Katherine's mother.

At approximately 1 p.m. on January 13, Rodney Cox was washing his truck in front of his residence (located four homes from the Chiapellas'

residence), when he noticed a college-age man twenty feet away, on the same side of the street. The individual was African-American, approximately 6 feet 2 inches to 6 feet 3 inches tall, weighed approximately 180 to 190 pounds, and was wearing a long-sleeved, white hooded sweatshirt with front pockets and lettering on the front, as well as "walkman"-type black headphones. Cox observed the man walk toward the Chiapella residence, and approximately one hour later saw him walking along the street and up the Chiapellas' driveway. A minute later, Cox observed the man cross to the other side of the street. Cox did not identify defendant at an "in-person" lineup, but did select defendant's photograph as one of five which resembled the man he had seen. At trial, Cox identified the man as defendant.

Diana (who married defendant in November 1987) testified that she moved in with defendant on January 9, 1987 (at which time her parents discontinued providing her with financial support). On January 13, she and defendant had an argument over money. Defendant left their apartment with a bicycle at approximately 2 p.m., returning with the bicycle approximately two hours later. At that time, defendant informed Diana he had received some money from his father in Texas and asked her to prepare a budget based upon assets of $3,000.

On the following day, defendant proceeded to a bank, where he cashed a check dated January 13, 1987, for $3,000, made out to defendant and executed by Katherine. It later was determined the check had not been entered in Katherine's check register, although customarily she recorded the checks she had written. Defendant received the cash primarily in $100 bills. On that date, defendant paid in cash to his landlord the amount of late rent plus $1,277.50, representing all sums due on the lease through July 1, 1987. Defendant paid in cash an $85 traffic fine at North County Municipal Court, and paid in cash $112 to K-mart and $144.63 to Safeway Stores to cover checks he previously had written on insufficient funds. That day, defendant returned his roommate's knife, which later was determined to contain blood on the finger recess of the knife blade.

On the morning and evening of January 14, and again on January 15, Ms. Bullard telephoned the Chiapellas but received no answer. The newscarrier who delivered the Chico Enterprise Record testified he delivered it at approximately 4 p.m. on January 13. On the following day, he delivered the newspaper at approximately the same time, noticing that the previous day's paper remained on the porch. On January 15, Joseph Chiapella stopped at his parents' residence and, receiving no response to his knock, dropped a letter through the slot in the front door. On January 16, Lois Cox, a neighbor, stopped by the Chiapellas' residence, rang the doorbell, and, receiving no

response, stacked the accumulating newspapers in a corner of the porch. On the same day Audrey Powers, another neighbor, removed the three morning and four evening newspapers, leaving a note.

After Ms. Bullard expressed her concern, Joseph Chiapella entered his parents' residence on January 17 and noticed a large amount of mail that had accumulated in the entryway near the mail slot in the front door, including the envelope he had left on January 15. Upon entering the main bedroom, Joseph discovered his father, dead. Joseph entered the bathroom and discovered the words, "just the beginning" written in lipstick on the mirror. The same words were written on the mirror in another bathroom. Joseph went into the kitchen and called two friends, the emergency "911" service, and his wife. While speaking to her, he saw his mother dead on the kitchen floor, on the other side of the counter.

Dr. Gwen Hall, a forensic pathologist who examined the bodies in the residence and later performed autopsies on them, testified as to their condition. We summarize this testimony at considerable length, because it bears upon some of the issues raised on appeal, including the sufficiency of the evidence of torture.

Katherine was discovered lying on her back, her head and face covered by a blanket. Her mouth had been gagged and her hands tied behind her back with three separate bindings consisting of strips of strawberry-patterned cloth. (When Ms. Gearing sublet her apartment to defendant, she left behind a set of strawberry-patterned sheets and a matching pillowcase.) Katherine's skirt was pulled up around her hips, and she was not wearing underpants, although there was no evidence of sexual assault. Fecal matter was present on her pubic area. Her purse, its contents spilled out, was located nearby.

Prior to Katherine's death, her shirt had been pulled up above her chest and a large knife had been thrust deeply into Katherine's left breast, causing damage to the lung and aorta and breaking four ribs. The knife had been moved within the body, creating a backwards C-shaped wound, and was protruding from the body at the time it was discovered. Prior to death, Katherine had received an additional stab wound to her upper abdomen above the navel, two inches deep and consistent in size with the knife that defendant returned to Eyrich.

Prior to death, Katherine also had suffered massive injuries to the head and face. She had incurred a three-and-one-half-inch-long laceration above the left eye, exposing the fractured bone of the forehead, which was caused by a strong blow from a hard instrument, possibly from a dented and bloody

fire extinguisher found next to William's body. Prior to death, her nose had been broken and she had received a relatively minor injury to her lower lip. She had died from multiple trauma, primarily from the forehead and chest wounds.

William was discovered lying on the rug, his hands tied behind his back to a desk chair, which had been knocked over, his head and face covered by a pillowcase. A large knife found inside his chest had been driven completely inside his body; even the handle was not visible above the skin surface. A sock was used to gag his mouth, and there was a loose binding around his neck. He had suffered 13 wounds. (1) A large laceration and contusion above the right eye had been inflicted by blunt trauma, causing a fracture in the deep skull and bleeding in the ear canal. (2) There was a separate, large blunt-force laceration higher on his forehead above wound No. 1. (3) There was another blunt trauma wound to the right of, and approximately the same level on the face as, wound No. 2. (4) There was a blunt trauma wound behind the right ear. (5) Two separate, blunt-force lacerations had been inflicted in the center back of the head. (6) A small, superficial cut by a sharp instrument such as a knife had been made on the left front of the neck. (7) A long laceration had been made at the center front of the neck. (8) A stab-type wound had been made with a sharp instrument toward the right side of the neck. (9) William's lower jaw had been fractured by blunt force. (10) The upper jaw was severely fractured, with blunt-trauma injuries to the upper lip and tissues beneath it. (11) There was a wound on the upper left chest caused by the large knife having been driven completely inside the body with a great amount of force, as if someone had stomped on the knife or had used a heavy object (such as the fire extinguisher found near the body) to pound on it. The wound was made using several thrusts of the knife. (12) There was a wound to the lower left back, caused by the knife protruding through the body from the other side (wound No. 11). (13) There were two wounds above wound No. 12, approximately one-quarter inch deep, caused by a sharp instrument, consistent in size with Eyrich's knife.

Dr. Hall testified, that, based upon the amount of internal and external bleeding that had occurred, wound Nos. 1, 2, 3, 4, 5, 6, 7, 8, 11, and 13 were premortem. The wounds would have caused pain if inflicted while William was conscious. Wounds Nos. 1 and 2 could have caused William's death. The cause of death was multiple trauma, caused primarily by the large chest wound and injuries to the right side of the head.

Dr. Hall was unable to determine which of the two victims had died first. The pathologist could not determine the sequence in which the wounds upon William had been inflicted, nor which of the three knives had inflicted

specific injuries. The blows received by the victims were sufficient to cause unconsciousness, and it was probable each victim had been unconscious prior to death, although it could not be determined for how long.

Two crumpled checks, made out in Katherine's handwriting for cash, but unsigned and numerically immediately preceding the check cashed by defendant, were found inside the front doorway of the residence. A bloody copy of the San Francisco Chronicle newspaper dated January 13, 1987, was found open on the kitchen table. In the study, defendant's name and current address were written in defendant's handwriting on a sheet of paper found on the desk. Defendant's left thumbprint was obtained from a Wells Fargo automatic teller slip found on the desk. A shoe print was discovered on the plastic floor runner beneath the desk. An unused portion of cloth similar to the bindings used on the victims was found beneath a chair near the desk. Envelopes containing checks had been opened and the contents strewn on the desk and floor. There were linear markings on the carpet from the study to the bedroom where William was found.

On January 21, 1987, Chico Police Department Investigators Rodney O'Hern and Terry Moore and Captain Robert Horton executed a search warrant on defendant's apartment on West 9th Street. The officers located sheets with a strawberry pattern that matched the design found on the bindings used to tie up the Chiapellas. The officers did not find pillowcases matching the sheets in the apartment. The officers seized a pair of black tennis shoes having a small amount of blood on them and possessing a design on the soles that proved to match the design left by the shoe print located in the Chiapellas' study. The officers found a white hooded sweatshirt with lettering on the front and also located two "walkman" radios, one of which had a black headset.

2. *Defendant's arrest*

On January 21, 1987, while officers still were present at the apartment, defendant arrived and was arrested. At the time of his arrest, defendant provided an alibi, stating he had been out of town "partying" with his girlfriend and roommate all day and evening on January 13, 1987.

During an interview at the police station that evening, defendant gave the following version of the events. Defendant told the police he had met Katherine in August 1986 at the Employment Development Department when she posted an advertisement for a yard work job. Defendant told officers that three days later Katherine picked him up in her vehicle and paid him $50 after he allowed her to orally copulate him. Between August and

December 1986 they met on over 12 occasions. Each time, Katherine picked him up in her vehicle and paid him $200 to $300 in cash. After approximately four meetings, in October or November 1986, Katherine wrote him a check for $550 on an account at Bank of America, and defendant deposited the check in his account.

Defendant described an episode in which he and Katherine went to the Thunderbird Lodge in Chico. Katherine retrieved a blow-up doll from the trunk of her vehicle, carried it inside the motel room, and watched while defendant had sexual intercourse with the doll, an act for which he received $1,000 in $100 bills. On January 9, 1987, Katherine and defendant went to the Thunderbird Lodge, room 96, where Katherine had registered. Katherine watched while defendant placed a battery operated machine on his penis and climaxed, after which Katherine swallowed the seminal fluid. Katherine gave him the $3,000 check for this activity. Defendant told the police he had received the check on January 13, later stating the check had arrived on January 14. Defendant told the police he and Katherine did not meet at the Chiapellas' house, and that he never had gone to their residence.

During the interview, defendant also told the officers that on January 13, 1987, he remained at his apartment until approximately noon. Following a minor argument with his then girlfriend, defendant, clad in a black and gray Puma warm-up outfit, went to Acker Gym, arriving at 1:30 p.m. and remaining two to three hours. At that location he met with a basketball coach, Kirk Freitas, as well as Shawn Hicks and Gerald Boles. He returned to his apartment at approximately 4 p.m., and he and his then girlfriend went out that evening to see the film, "The Morning After."

Defendant told the police he received a student loan payment of $1,250 in October 1986 and another payment of $1,250 in December 1986, but had no other income. Defendant borrowed a knife from Mr. Eyrich in order to repair his stereo antenna. Defendant stated he had not worn his black tennis shoes since the previous fall and had not lent them to anyone. He remembered that the strawberry-patterned sheets had been in the apartment when he moved there in December 1986. The same day as the interview, defendant had his hair cut very short.

The police did not find any semen stains in the Chiapellas' automobile or any sexual aids or materials in the Chiapellas' residence or automobile. Katherine's checking account did not reflect earlier checks made out to defendant. Defendant's bank account did not reflect a deposit of $550 but did show that 43 checks had been returned for insufficient funds, and that on December 23, 1986, the account was closed for insufficient funds. The

police also discovered that neither Katherine nor defendant had registered at the Thunderbird Lodge on January 9, 1987, and that there was no room 96 at that motel. Coach Freitas and Mr. Boles testified they had met with defendant, who was wearing gray "sweats" and tennis shoes, and carrying a "walkman" radio, at the gym on January 7, 1987, but not thereafter.

### 3. *Defendant's escape from jail*

On May 11, 1987, defendant was an inmate in the Butte County jail at Oroville, awaiting trial on the above described offenses. That afternoon defendant could not be located at the jail. It was discovered that the wire mesh screen over a jail window had been forced open, the window had been broken, and an orange jumpsuit was hanging from the jail window.

At approximately 2 p.m. on that day, Douglas Kronen, who lived one-half mile from the Butte County jail, entered his residence. Kronen heard a noise and discovered defendant, whose arms were cut and bleeding, pointing a gun at him. Defendant told Kronen, "Don't do nothing stupid. I don't want to hurt you," ordered him to lie down on the floor, and threw a blanket over his head. Defendant placed a foot, knee, or hand on Kronen's back and informed him that defendant "was going to have to" tie him up. Defendant had removed and torn into pieces a pillowcase that had been in one of Kronen's children's bedrooms. Defendant grabbed a knife, placed his foot on Kronen's back, and said, "I can't drive." Fearing for his safety and that of his children, who were due to return from school, Kronen offered to drive defendant wherever he wanted to go.

The two men drove away in a truck, once stopping to purchase gasoline. When Kronen reentered the truck, defendant instructed him to "head for Chico," and Kronen complied, until they noticed several police vehicles on the highway, at which point defendant moved down in his seat and instructed Kronen to "head for Sacramento." On the way, defendant volunteered to Kronen that defendant had not committed "the killings." When Kronen suggested that defendant return to jail if he was innocent, defendant responded he would rather be dead than in jail, and that he did not feel he would receive a fair trial because he was African-American. Defendant said he did not know how his sheets happened to be at the residence of the persons who were killed. When they reached Sacramento, defendant told Kronen to let him out of the truck. Kronen did so and contacted the police. Later that day, after a brief chase on foot, the police apprehended defendant, who was carrying a water pistol at the time.

The trial court admitted evidence of two subsequent escape attempts by defendant, solely on the issue of flight as evidence of consciousness of guilt.

(§ 1127c.) On September 26, 1988, defendant, still an inmate at Butte County jail, pulled Jim Corbin, a guard, into defendant's section, grabbed him around the chest and throat, and slammed him against the cell bars. Corbin was able to say, "jail break," and two officers came to his rescue. A gun made of soap, a "shank," a hacksaw blade, and three stuffed jumpsuits were discovered inside defendant's cellblock, and the bars on one cell door in that block had been sawed. After defendant's transfer to Placer County jail following a change of venue to that county on defendant's motion, on March 9, 1989, it was discovered that defendant had cut through the plaster in the ceiling of one of the jail cells, patching the hole with tape and toothpaste. Defendant, stating he wished to get through the ceiling in order to escape from the jail, had instructed another inmate how to grind through the brick. Defendant had attempted to make a hole in a wall, using as a tool a vent he had removed.

## B. *The defense case*

Defendant received over $3,000 in student financial aid during the period September to December 1986. Paul Widmon, a newscarrier who delivered the Sacramento Bee newspaper in the neighborhood of the Chiapellas' residence, testified that early one morning between January 1 and January 17, 1987, he noticed a dark-complected man drive a pickup truck past the Chiapella residence. Defendant did not own or possess a pickup truck.

One of the investigating officers testified Attorney Bob Laughlin had informed him that on the afternoon of January 13, 1987, the Chiapellas had departed between 3:15 p.m. and 3:20 p.m. from his office, located three to four miles and ten minutes by automobile from the Chiapellas' residence. The distance between defendant's apartment and the Chiapella residence was 2.6 miles. A defense investigator timed the shortest route between those points, determining that by vehicle it took 9 to 10 minutes, by bicycle 12 minutes, and on foot 39 to 40 minutes to traverse that distance.

Defendant's wife, Diana, testified that on January 13, 1987, defendant and she attended the 8 p.m. showing of the film, "The Morning After," at a theater in Chico, the theater manager confirming the film had been shown at that time on that date. Detective O'Hern testified that the Chiapellas' son, Dr. Joseph Chiapella, told him he last had spoken to Katherine on January 15 or 16, 1987.

After hearing the evidence described above, the jury found defendant guilty of two counts of first degree murder (with special findings that the murders were willful and premeditated and committed during the course of a

robbery), with two enhancements for personal use of a deadly weapon, and guilty of one count of robbery, also finding true the four charged special-circumstance allegations. The jury also found defendant guilty of the offenses of escape from jail and kidnapping.

## II. *Penalty Phase Evidence*

The prosecution did not present additional evidence in aggravation. The jury was instructed to consider in aggravation the circumstances of the robbery murders and the kidnapping, as well as the battery of the prison guard.

The defense presented the following evidence in mitigation. In February 1989, an EEG (electroencephalogram) examination and a BEAM (brain electrical activity mapping procedure) examination were performed on defendant. The EEG demonstrated abnormal electrical activity, indicative of seizure disorders. Defendant had physiological abnormalities in the frontal region and the right frontal and central temporal regions of the brain, believed to be a developmental defect. These areas of the brain gauge the appropriate level of emotional response to a given situation. These abnormalities had been present for more than one year. Neurological testing of defendant, performed in March 1989, revealed a high probability that defendant suffered organic brain damage, although it could not be established whether he had brain damage two years previously. Defendant's "significant mild" brain damage subjected him to lapses in which he could not function normally.

During 1987, there were 13 escapes from Butte County jail, and during 1988, 6 escapes from that facility. Throughout that period, the jail experienced overcrowded conditions; it was understaffed and had an inadequate physical plan.

The testimony given by defendant's high school and college football coaches and high school basketball coaches stressed that defendant was sportsmanlike and an excellent player, as well as cooperative, helpful, polite, respectful, very well respected, and good with children. A teammate furnished similar testimony.

The testimony provided by one of defendant's high school teachers, an instructional aide, and a cheerleading adviser portrayed defendant as respectful and cooperative, and a good student, leader, and outstanding player. Defendant had not presented any disciplinary problem at a summer youth job-training camp. Defendant's minister, a fellow churchgoer, and a family

friend portrayed defendant as polite, respectful, considerate, and a regular churchgoer. A friend of defendant, who had lived with defendant's family for a year during high school, and the friend's parents reported their fondness for defendant and stated they considered him a member of their family. Another parent of one of defendant's friends testified defendant was polite, considerate, and respectful.

Defendant's wife, Diana, testified to her love for him, describing him as loving, compassionate, sensitive, sincere, honest, extremely thoughtful, and generous. Defendant had wanted to play professional football or join the Air Force. He had introduced Diana to Christianity and had influenced her to join the church. Defendant's brother, Bryant, testified to his love and admiration for defendant and their good relationship. Defendant had assisted Bryant with school assignments, particularly with the subject of psychology. Defendant's sister, Gwen, admired defendant, describing his encouragement of her and his assistance with her mathematics homework. Defendant's stepfather, Chris, described defendant as warm, kind, and helpful. He testified that defendant had had a happy childhood and was a member of a close family, and that he loved defendant. Defendant's mother, Pearlie Mae, reported defendant had had a happy childhood and got along with his siblings. Defendant was religious and a frequent, willing churchgoer. She dearly loved defendant. Defendant's sister, Sharon, also testified to her love for defendant and reported that defendant was a good athlete and had a good sense of humor. Defendant had sent her letters in which he had denied committing the murders. The defense also produced a number of photographs depicting defendant with his family and attending such functions as high school graduation.

At the conclusion of the penalty phase, the jury fixed the penalty at death.

DISCUSSION

I. *Jury Selection Issues*

A. *The trial court's denial of defendant's Wheeler motion*

██ Defendant contends the trial court erred in denying his motion, pursuant to *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], for mistrial, to quash the jury venire, and to commence jury selection anew, on the ground the prosecutor exercised a peremptory challenge to excuse the sole African-American juror in the venire, Mrs. Casey.

██ A presumption exists that a prosecutor has exercised his or her peremptory challenges in a constitutional manner. (*People* v. *Clair* (1992) 2

Cal.4th 629, 652 [7 Cal.Rptr.2d 564, 828 P.2d 705]; *People* v. *Wheeler, supra,* 22 Cal.3d 258, 278.) Nonetheless, it is well established that the use of peremptory challenges to remove prospective jurors solely on the basis of a presumed group bias, based upon membership in a cognizable group, violates both the federal and state Constitutions. (*Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *People* v. *Wheeler, supra,* 22 Cal.3d 258.) " 'Group bias is a presumption that jurors are biased merely because they are members of an identifiable group,' " distinguished on grounds such as race, religion, ethnicity, or gender. (*People* v. *Garceau* (1993) 6 Cal.4th 140, 170 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People* v. *Fuentes* (1991) 54 Cal.3d 707, 713 [286 Cal.Rptr. 792, 818 P.2d 75]; see *J.E.B.* v. *Alabama* (1994) 511 U.S. __, __ [128 L.Ed.2d 89, 101-104, 114 S.Ct. 1419, 1425-1427]; *Powers* v. *Ohio* (1991) 499 U.S. 400, 407-410 [113 L.Ed.2d 411, 422-425, 111 S.Ct. 1364].)

■ " ' "If a party believes an opponent is improperly using peremptory challenges for a discriminatory purpose, that party must make a timely objection and a prima facie showing that the jurors are being excluded on the basis of group bias. [Citation.] To establish a prima facie case, the moving party should first make as complete a record as possible; second, the moving party must establish that the persons excluded are members of a cognizable group; and third, the moving party must show a strong likelihood that such persons are being challenged because of group association." ' " (*People* v. *Garceau, supra,* 6 Cal.4th 140, 171; *People* v. *Turner* (1994) 8 Cal.4th 137, 164-165 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *People* v. *Howard* (1992) 1 Cal.4th 1132, 1153-1154 [5 Cal.Rptr.2d 268, 824 P.2d 1315]; *People* v. *Fuentes, supra,* 54 Cal.3d 707, 714; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1216 [255 Cal.Rptr. 569, 767 P.2d 1047]; see *Batson* v. *Kentucky, supra,* 476 U.S. 79, 96-98 [90 L.Ed.2d 69, 87-89].)

A party may make a showing of a "strong likelihood" by, inter alia, pointing out "that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . if [defendant is a member of the excluded group], and especially if, in addition, his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention." (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 280-281, fn. omitted.)

In support of his motion, defendant emphasized that the prosecutor had excused the only African-American juror in the venire. It is clear, however, that defendant did not rely solely upon the circumstance that the prosecutor's peremptory challenge was directed toward the only African-American juror; defendant made an effort to set forth other relevant circumstances. (Cf. *People* v. *Garceau, supra,* 6 Cal.4th 140, 171; *People* v. *Howard, supra,* 1 Cal.4th 1132, 1154.) He presented evidence, compiled from the biographical information of 50 prospective jurors, that Mrs. Casey was typical in terms of her age (58 years), employment status (housewife with prior employment outside the home), length of residence in the community (17 years), and marital status and children (1 marriage, 2 adult children), and in that her husband had served in the armed forces. Defendant also compiled a list showing that, like Mrs. Casey, 24 other prospective jurors had expressed views suggesting opposition to, or concerns with, the death penalty. Defendant presented evidence indicating that, in an earlier trial in Butte County involving an African-American defendant, the same prosecutor had employed a peremptory challenge against the one African-American prospective juror remaining in the venire after for-cause challenges had been exercised. Defendant also emphasized that Mrs. Casey and defendant both were African-American, whereas the victims were Caucasian.

The court denied the motion on the ground that defendant had not established a prima facie case, the court determining that during voir dire Mrs. Casey had shown indecisiveness and could not decide whether she would be able to follow the law.[2] " '[W]hen a trial court denies a *Wheeler* motion without finding a prima facie case of group bias the reviewing court considers the entire record of voir dire. [Citations.] As with other

---

[2]The trial court stated: "I'm denying the motion gentlemen. And I do not find a prima facie case. [¶] I realize that I could go into this matter further by announcing that there is a prima facie case, and receive the explanation of the Prosecutor. [¶] But I choose not to, because of the fact that I don't believe that there is a prima facie case. [¶] My notes at the time that we interviewed this juror—and impressions—revealed that at the very time that we interviewed Mrs. Casey, my exact quotation in my notes is: [¶] This is a case where a Wheeler motion would be inappropriate, because of the fact that she is indecisive and cannot guarantee that she would vote a certain way. [¶] And in my language that does not mean that, that would vote a certain way, based on the facts. But that she couldn't decide whether or not she would be able to follow the law. [¶] That is reflected in her transcript, as well. [¶] And, frankly, I do not see because of this it would be difficult to establish a pattern—and I would put pattern in quotes of—of challenges. [¶] Because there is only Mrs. Casey, who is black, on the jury panel. But there are abundant other reasons why I would have expected a peremptory challenge on this particular matter. And, as such, her wrestling with these issues indicated to me that[,] although a cause challenge was certainly not called for, that a peremptory challenge was going to be expected in any event. [¶] I don't think that a prima facie case has been made out for those reasons. And for that reason, I deny it. For those reasons that I have stated, as well as the reasons that will apply throughout the record in the actual transcript of her record [*sic*][,] the motion is denied."

findings of fact, we examine the record for evidence to support the trial court's ruling. Because *Wheeler* motions call upon trial judges' personal observations, we view their rulings with "considerable deference" on appeal. [Citations.] If the record "suggests grounds upon which the prosecutor might reasonably have challenged" the jurors in question, we affirm. [Citation.]' " (*People* v. *Garceau, supra,* 6 Cal.4th 140, 171-172; *People* v. *Howard, supra,* 1 Cal.4th 1132, 1155; *People* v. *Sanders* (1990) 51 Cal.3d 471, 498, 501 [273 Cal.Rptr. 537, 797 P.2d 561]; see *Batson* v. *Kentucky, supra,* 476 U.S. at pp. 88, 98, fn. 21 [90 L.Ed.2d at pp. 81, 89].)

When Mrs. Casey was asked by the court how she felt about serving on a jury for the first time, she responded, "Not good," and that it "was scary" to do something she never had done before. When asked whether she would decline to find first degree murder even if the prosecutor had established that crime, out of fear of having to decide whether to apply the death penalty, she initially stated she was against persons being put to death, as well as against "people killing people. [] That is hard to answer," then responded in the negative, also responding in the negative to the question whether she would refuse to vote on the issue of special circumstances if these were shown. When asked whether she could conceive of situations in which she might vote for the death penalty if first degree murder and special circumstances were established, she answered in the affirmative.

Upon questioning by defense counsel, Mrs. Casey reiterated she did not believe in the death penalty, and also did not believe in "nobody killing anybody either," so that she was "in-between or whatever." She also stated she could conceive of a case in which the death penalty would be appropriate, if the circumstances of the case were "awful bad" and if she "believed it."

Upon questioning by the prosecutor, Mrs. Casey reiterated that she truly did not believe in the death penalty, and stated: "But if it is bad, it [is] really bad and I felt that, you know—I hate death. I don't know how to express myself, really. But I really hate to see anybody be put to death. And I hate to see someone take a life. I don't care who it is. So—it is—it is hard for me to express it. [¶] But I could, if proven to me, to, no doubt, that it was a crime, then I don't think I would hesitate." She indicated she did not know whether the prosecutor was at a disadvantage because of her views; she "couldn't say fully," but would attempt to be completely open and objective about the issue. When the prosecutor asked whether she honestly believed she could vote for a verdict that would cause defendant to be sent to the gas chamber, she replied: "I can't sit here and really say for sure if I could. But, if it is proven to me, truly proven to me, and I feel deep down inside that he did it,

I could. I think I could." When the prosecutor asked, "You think you could?" Mrs. Casey said, "Yes, I have to say I think I could. This is all new to me. So I am very upset with it." She further stated that her feelings concerning the death penalty (that she did not believe in it) would make it difficult for her to make a decision on that issue. She could not say "yes or no" to whether her feelings about the death penalty might substantially impair her ability to evaluate fairly all the evidence pertaining to the death penalty. She indicated that, despite her not believing in the death penalty, she believed she could vote in favor of it if she heard facts and circumstances that warranted it, but then stated: "I can't say—I can't come out and say fully, yes, I could or, no, I couldn't, because I don't know the circumstances."

Following these statements, Mrs. Casey informed the court that her family possessed only one automobile, which her husband used when not carpooling, and that she could not depend upon automobile transportation. The trial court denied the prosecutor's for-cause challenge to Mrs. Casey, premised upon her statement that she did not believe in the death penalty, and the prosecutor later employed a peremptory challenge to excuse this prospective juror.

Because the trial judge had presided over all of the voir dire, he was in a good position to determine from all relevant circumstances whether a strong likelihood existed that the prosecutor had challenged Mrs. Casey solely by reason of her group association. (*People* v. *Howard, supra,* 1 Cal.4th 1132, 1156.) He properly could consider the nature of the prosecutor's voir dire, which was not desultory but rather reflected a thorough investigation of her views, especially as to her feelings concerning the death penalty. (*People* v. *Howard, supra,* 1 Cal.4th 1132, 1156.) Mrs. Casey's apparent opposition to, uncertainty about, and repeatedly contradictory responses pertaining to the death penalty, her indication she might be unable to apply the law in that regard, her apparent general apprehension at serving on a jury for the first time, as well as her concern over her transportation to the court for trial, indicate there were legitimate, race-neutral grounds upon which the prosecutor reasonably might have challenged her. (*People* v. *Garceau, supra,* 6 Cal.4th 140, 172-173; *People* v. *Howard, supra,* 1 Cal.4th 1132, 1156; *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1092 [259 Cal.Rptr. 630, 774 P.2d 659].)

As indicated above, defendant presented other matters to the court in an attempt to make a prima facie showing. His demonstration that Mrs. Casey generally appeared to be an otherwise typical member of the community, although a circumstance properly the subject of consideration, did not obviate the concerns evoked by her responses. Defendant's showing that 24

other prospective jurors had expressed views suggesting opposition to, or evidencing concern over applying, the death penalty, does not establish a prima facie case, because all except one of these prospective jurors were excused (almost all by the prosecutor), and the prosecutor's failure to excuse the remaining juror must be viewed in light of the circumstance that the juror was called later in the proceedings, when the prosecutor's remaining peremptory challenges were few. (See *People* v. *Johnson, supra,* 47 Cal.3d 1194, 1220-1221 [comparison of prospective jurors did not take into account such factors as the prosecutor's remaining peremptory challenges and the number of prospective jurors with a particular point of view].) Moreover, that juror indicated her understanding of and willingness to uphold the law, despite her reservations.

Assuming defendant's showing that the prosecutor had, in an unrelated case involving an African-American defendant, exercised a peremptory challenge in order to excuse an African-American prospective juror is relevant under *Wheeler* (22 Cal.3d 258, 285-287 [a defendant need not show that the same prosecutor has excluded all members of a cognizable group over a long period of time]; *Batson* v. *Kentucky, supra,* 476 U.S. at pp. 88, 92-96 [90 L.Ed.2d at pp. 81-82, 84-88]; see also *People* v. *Howard, supra,* 1 Cal.4th 1132, 1156, fn. 4) this showing is not very probative, in light of the isolated nature of the prior conduct (cf. *People* v. *Turner, supra,* 8 Cal.4th 137, 162, 168) and the record introduced in the trial court of the circumstances surrounding that excusal, indicating the prosecutor validly excused the prospective juror on the basis of the juror's legal training.

Although the prosecutor's excusal of all members of a particular group may give rise to an inference of impropriety, especially if the defendant belongs to the same group, that inference, as we have observed, is not dispositive (*People* v. *Howard, supra,* 1 Cal.4th 1132, 1156; *People* v. *Sanders, supra,* 51 Cal.3d 471, 500.) Moreover, in the present case the inference is of less weight, because the prosecutor excused only a single member of that group. In light of all the relevant circumstances, the trial court properly could find that defendant had not made a prima facie showing, and, accordingly, the burden did not shift to the prosecution to establish a neutral explanation, related to the particular case, for the peremptory challenge. (*People* v. *Turner, supra,* 8 Cal.4th 137, 164-165; *People* v. *Wheeler, supra,* 22 Cal.3d 258, 281.)

We also reject defendant's claim that his right under the Sixth Amendment to an impartial jury was violated. Although a defendant has a right to a jury drawn from a fair cross-section of the community as a means of ensuring his or her right to an impartial jury, he or she has no right to a

jury that reflects the racial composition of the community. (*Holland* v. *Illinois* (1990) 493 U.S. 474, 480, 482-483 [107 L.Ed.2d 905, 916, 918, 110 S.Ct. 803]; *People* v. *Garceau, supra,* 6 Cal.4th 140, 173; see also *Taylor* v. *Louisiana* (1975) 419 U.S. 522, 538 [42 L.Ed.2d 690, 702-703, 95 S.Ct. 692].)

■ Defendant's claim of a violation of his right to equal protection of the laws under the Fourteenth Amendment lacks merit because, as explained above, the record supports the trial court's finding that defendant failed to make a prima facie showing that this prospective juror was excluded on the basis of group bias. (*Hernandez* v. *New York* (1991) 500 U.S. 352, 363-367 [114 L.Ed.2d 395, 408-411, 111 S.Ct. 1859]; see *Batson* v. *Kentucky, supra,* 476 U.S. at pp. 88, 96-97 [90 L.Ed.2d at pp. 81-82, 87-88]; cf. *Johnson* v. *Vasquez* (9th Cir. 1993) 3 F.3d 1327.)[3]

B. *The trial court's denial of defendant's motion to excuse jurors for cause*

■ Defendant contends the trial court improperly denied defense motions to excuse for cause two prospective jurors who did not unequivocally state they would *not* automatically vote for the death penalty, and who thus called into question their ability to be fair and impartial. These two prospective jurors never were impaneled, however, having been excused following defense counsel's exercise of peremptory challenges against them. Defendant nonetheless argues that the trial court's failure to exclude these prospective jurors for cause violated his right to an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution and under the California Constitution (art. I, § 16), his right to due process of law under the Fourteenth Amendment and the California Constitution (art. I, §§ 7 & 15), and his right to a reliable penalty determination under the Eighth and Fourteenth Amendments and the California Constitution (art. I, §§ 7, 15, & 17), because he was deprived of the full exercise of his 26 peremptory challenges due to the trial court's error in denying his challenges for cause.

■ Both the federal and the state Constitutions guarantee a criminal defendant a trial by an impartial jury (*People* v. *Garceau, supra,* 6 Cal.4th

---

[3]Defendant asserts we should follow several United States Court of Appeals decisions holding, according to defendant, that under *Batson* a prima facie showing is made whenever a prosecutor has exercised one or more peremptory challenges against all members of a defendant's race. (*United States* v. *Iron Moccasin* (8th Cir. 1989) 878 F.2d 226, 229; *United States* v. *Roan Eagle* (8th Cir. 1989) 867 F.2d 436, 441; *United States* v. *Chalan* (10th Cir. 1987) 812 F.2d 1302, 1314.) These decisions do not persuade us to alter the conclusion we have reached above, and, as we have observed on prior occasions, we are not bound by decisions of the lower federal courts, even on federal questions. (*People* v. *Burton* (1989) 48 Cal.3d 843, 854 [258 Cal.Rptr. 184, 771 P.2d 1270]; *People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].)

140, 173-174; see *People* v. *Mickey* (1991) 54 Cal.3d 612, 683 [286 Cal.Rptr. 801, 818 P.2d 84]; *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 104 [270 Cal.Rptr. 817, 793 P.2d 23]; *People* v. *Bonin* (1988) 46 Cal.3d 659, 679 [250 Cal.Rptr. 687, 758 P.2d 1217]), made up of jurors who will not automatically vote for the death penalty, but who will consider the mitigating evidence presented. (*Morgan* v. *Illinois* (1992) 504 U.S. 719, 729, 733-736 [119 L.Ed.2d 492, 502-503, 505-507, 112 S.Ct. 2222]; accord, *Penry* v. *Lynaugh* (1989) 492 U.S. 302, 319 [106 L.Ed.2d 256, 278-279, 109 S.Ct. 2934].)

Whether the contention is that the trial court erroneously failed to exclude prospective jurors who exhibited a pro-death bias, or excluded prospective jurors who exhibited an anti-death bias, the same standard has been held to apply. (*People* v. *Pride* (1992) 3 Cal.4th 195, 227-228 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People* v. *Mincey* (1992) 2 Cal.4th 408, 456 [6 Cal.Rptr.2d 822, 827 P.2d 388]; *People* v. *Johnson, supra,* 47 Cal.3d 1194, 1224.) Under that standard, a juror may be challenged for cause based upon his or her views concerning capital punishment only if those views would "prevent or substantially impair" the performance of the juror's duties as defined by the court's instructions and the juror's oath. (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]; *People* v. *Mincey, supra,* 2 Cal.4th 408, 456.)

 If a defendant contends that the trial court wrongly denied a challenge for cause, he or she must demonstrate that the right to a fair and impartial jury thereby was affected. (*People* v. *Garceau, supra,* 6 Cal.4th 140, 174; *People* v. *Bittaker, supra,* 48 Cal.3d 1046, 1087-1088.) Initially, a defendant must establish that he or she exercised a peremptory challenge to remove the juror in question, exhausted the defendant's peremptory challenges, and communicated to the trial court the defendant's dissatisfaction with the jury selected. (*People* v. *Morris* (1991) 53 Cal.3d 152, 184 [279 Cal.Rptr. 720, 807 P.2d 949]; *People* v. *Bittaker, supra,* 48 Cal.3d 1046, 1087.)[4] "[I]f he can actually show that his right to an impartial jury was affected because he was deprived of a peremptory challenge which he would have used to excuse a juror who sat on his case, he is entitled to reversal; he

---

[4]The record discloses that defendant exercised peremptory challenges against these jurors and exhausted his peremptory challenges. It does not reflect, however, that defendant expressed to the trial court any dissatisfaction with the jury as sworn. (See *People* v. *Raley* (1992) 2 Cal.4th 870, 904-905 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People* v. *Morris, supra,* 53 Cal.3d 152, 184; *People* v. *Bittaker, supra,* 48 Cal.3d 1046, 1087-1088.) Therefore, defendant may not complain on appeal as to the composition of the jury. In view of language in *People* v. *Bittaker, supra,* 48 Cal.3d 1046, 1087-1088, suggesting an express statement of dissatisfaction is unnecessary if a defendant exhausts his or her peremptory challenges, and the consequent difficulty in identifying this issue as ineffective assistance of counsel, we shall review the trial court's ruling despite this procedural deficiency.

does not have to show that the outcome of the case itself would have been different. [Citations.]" (48 Cal.3d at pp. 1087-1088; cf. *People* v. *Mason* (1991) 52 Cal.3d 909, 954 [277 Cal.Rptr. 166, 802 P.2d 950] [6th Amend. claim obviated by exercise of peremptory challenges to exclude prospective jurors not excused for cause, without comment by this court on other potential constitutional claims].)

Our duty is to examine the context in which the trial court denied the challenge, in order to determine whether the trial court's decision that the juror's beliefs would not "substantially impair the performance of [the juror's] duties" fairly is supported by the record. (See *People* v. *Mincey, supra*, 2 Cal.4th 408, 456-457; *People* v. *Johnson, supra*, 47 Cal.3d 1194, 1224.) Where a prospective juror provides conflicting answers to questions concerning his or her impartiality, the trial court's determination as to that person's true state of mind is binding upon the appellate court. (*People* v. *Pride, supra*, 3 Cal.4th 195, 229; *People* v. *Mincey, supra*, 2 Cal.4th 408, 456; *People* v. *Bittaker, supra*, 48 Cal.3d 1046, 1089.)

 In the present case, prospective juror Carrington initially indicated he believed that if a defendant had committed deliberate, first degree murder, he or she should receive the death penalty, that this form of punishment was not imposed frequently enough, and that a defendant's background or life experiences would not affect his decision to impose the death penalty. Mr. Carrington also indicated, however, that he would be able to put aside his personal views concerning the death penalty, that those views would not substantially impair his ability to conduct the required weighing process, and that he would be able to vote in favor of life imprisonment without the possibility of parole if that were the appropriate penalty in light of the evidence introduced at the penalty phase, would weigh the evidence, and would not vote automatically in favor of the death penalty if defendant were found guilty of intentional, premeditated murder with special circumstances present. The trial court denied the challenge for cause, noting this prospective juror had indicated quite strongly he would consider the facts of the case, would not apply the death penalty automatically, and was an earnest person whose intention was to follow the law.

In his responses to written questions, prospective juror Roberts indicated he believed the death penalty served as a deterrent and decreased crime. When asked initially, this juror stated he did not believe he would vote automatically in favor of the death penalty, but then indicated he would do so. When asked whether he would vote in favor of the death penalty, regardless what evidence was presented as to defendant's background, Mr. Roberts indicated he "could go either way" and subsequently stated that,

considering this background information, he would not vote automatically in favor of the death penalty. Mr. Roberts stated that he would follow the guidelines provided by the court and consider such factors as defendant's age and family, and that he could be neutral at the inception of the penalty phase. In denying this challenge for cause, the court alluded to the prospective juror's initial struggle to understand certain questions concerning whether he favored the death penalty, his lack of a consistent viewpoint in favor of the death penalty, his responses that he would follow the court's instructions, and his forthright demeanor and neutrality toward both the defense and the prosecution positions.

The trial court did not err in denying defendant's challenges for cause to these two prospective jurors. Neither juror expressed views indicative of an unalterable preference in favor of the death penalty, such that their protestations that they would follow the law would not "rehabilitate" them. (Cf. *Morgan* v. *Illinois, supra,* 504 U.S. 719, 733-736 [119 L.Ed.2d 492, 505-507, 112 S.Ct. 2222].) Moreover, because both jurors provided conflicting responses relating to their views concerning the death penalty, as indicated above, the trial court's determinations as to their state of mind, based in part upon their demeanor, are binding upon this court. The prospective jurors' statements did not demonstrate that their views would substantially impair the performance of their duties as jurors. (See *People* v. *Mincey, supra,* 2 Cal.4th 408, 457; *People* v. *Johnson, supra,* 47 Cal.3d 1194, 1224; cf. *People* v. *Coleman* (1988) 46 Cal.3d 749, 763-764 [251 Cal.Rptr. 83, 759 P.2d 1260]; *People* v. *Bittaker, supra,* 48 Cal.3d 1046, 1088-1090.)

## II. *Guilt Phase Issues*

### A. *Admissibility of defendant's postarrest statements*

Defendant contends that his question, postarrest, "Did you say I could have a lawyer?" constituted an invocation of his right to counsel, and that the trial court erred in ruling that subsequent statements made by him in the course of police interrogation were not obtained in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

At the preliminary hearing, defendant moved to exclude evidence of his statements based upon this alleged violation of *Miranda*; after the motion was denied, he renewed it prior to trial, again relying upon the evidence received at the preliminary hearing. In support of his motion, defendant presented the following evidence: at approximately 3 p.m. on January 21, 1987, three police officers went to defendant's apartment for the purpose of

serving a search warrant as to the premises and an arrest warrant on defendant. Not finding defendant at home, they proceeded to search the residence. Defendant arrived and entered the apartment, but upon discovering one of the officers, and being informed he was under arrest, defendant began backing out of the apartment. The other two officers, summoned by the third, grabbed defendant's arms, held him against the outer wall of the apartment, and handcuffed him, informing him he was under arrest for murder. Defendant, who struggled during the arrest, was placed stomach down on the floor of the apartment.

One of the officers began reciting the *Miranda* warnings, but was interrupted several times by defendant, who was agitated and loud. At one point, the officer told defendant to "shut up" so the officer could read him his rights. Defendant repeatedly asked why he was being arrested. Defendant was informed several times that he was being arrested for the murder of the Chiapellas, and at one point the officer referred to the occurrence of the murders on Tuesday of the previous week. Defendant responded he had an alibi for that date, because he and his girlfriend had been at a party all day. The officer cautioned defendant that the police would "check it out."

The officer read the advisements concerning defendant's right to remain silent, that anything he said could and would be used against him in a court of law, of his right to an attorney before any questioning, if he wished, and to have an attorney appointed if he could not afford to hire one, and that if "you decide at any time to exercise your rights and not answer any of the questions or make any statements—and I gave up at that point." Defendant then said, "Did you say I could have a lawyer?" The officer told him, "yes, if he wanted one." Defendant did not respond and remained silent. The police did not ask defendant any questions at that time.

Defendant was transported to the Chico Police Department and, on the same day (January 21), at approximately 8 p.m., the police read to defendant the full *Miranda* advisements, including his right to have counsel present during questioning and to have counsel appointed in the event defendant could not afford an attorney. Defendant also was asked whether he understood and wished to waive his rights, and proceeded to waive them. Near the conclusion of that interview, at approximately 8:40 p.m., defendant asked to use the telephone. An officer told him he could do so, but forgot to comply with defendant's request. A second interview was conducted from 9:10 p.m. to 10:08 p.m. At the end of the second interview, when asked whether he had any questions, defendant asked when a lawyer would be appointed for him,

and an officer told him that would occur during arraignment. Both interviews were tape-recorded in total.[5]

The statements that defendant sought to exclude were in the nature of admissions. In addition to making exculpatory statements denying he had committed the murders or ever had been to the Chiapellas' residence, defendant attempted to explain his cashing of a check made out to him by Katherine in the amount of $3,000 on the day following the murders. He asserted that on January 9, 1987, as on a number of prior occasions during the fall of 1986 and the early part of 1987, he had been paid by Katherine Chiapella to perform sexual acts. Defendant claimed he and Katherine had gone to a particular room at the Thunderbird Lodge. Defendant reported that on this occasion, as well as on others, sexual devices were employed, which Katherine transported in the trunk of her vehicle. Defendant also claimed that he had borrowed his roommate's knife in order to fix his own stereo antenna, and insisted that for a number of months he had not worn the bloodstained shoes found at his apartment. The trial court determined beyond a reasonable doubt that defendant's statements were voluntarily made.

1. *Whether defendant's failure to renew his motion at trial precludes appellate review of his Miranda claim*

As an initial matter, the Attorney General contends that, by failing to renew the *Miranda* motion in Placer County, defendant waived the issue. Defendant unsuccessfully moved, during his preliminary hearing in 1987, to exclude his statements on the ground they were obtained in violation of *Miranda*. In March 1988, prior to the commencement of trial in Butte County, defendant renewed his motion to exclude the statements on *Miranda* grounds. The court denied the motion. In March 1989, following the change of venue to Placer County, defendant again moved to suppress these statements, this time on the ground that the probability that their admission would prejudice defendant substantially outweighed their probative value. (Evid. Code, § 352.) Although at that time defendant did not renew his objection expressly on the basis of *Miranda*, the Placer County judge observed, after the prosecutor advised him that the judge in Butte County already had ruled upon the admissibility of the statements, that the Butte

---

[5]The following day (January 22, 1987), upon being advised that defendant wished to speak to them, the police officers met with defendant again. At the outset of this interview, defendant asked when he would see his lawyer and again was advised that one would be provided at the arraignment. The police did not repeat the *Miranda* advisements or obtain defendant's waiver during this very brief interview. This inquiry by defendant formed the basis for his March 1, 1989, motion seeking to suppress certain later statements on the ground they were obtained in violation of *Miranda*, but defendant's present contention on appeal is related solely to the statements elicited during the interviews conducted on January 21, 1987.

County court expressly had ruled that *Miranda* did not bar admission of the statements. The Placer County judge then stated that the only remaining questions were whether the statements were relevant and whether they should be sanitized, and defense counsel agreed with this assessment.[6] Defendant did not specifically renew his objection at the time the statements were admitted into evidence.

We conclude that, under the circumstances described above, defendant did not waive the *Miranda* issue. ▇▇▇ It is true that a judgment will not be reversed on the ground that evidence has been admitted erroneously, unless " 'there appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so *stated as to make clear the specific ground of the objection or motion . . . .*' " (*People* v. *Mattson* (1990) 50 Cal.3d 826, 853-854 [268 Cal.Rptr. 802, 789 P.2d 983], italics in *Mattson*, quoting Evid. Code, § 353, subd. (a).) "Specificity is required both to enable the court to make an informed ruling on the motion or objection and to enable the party proffering the evidence to cure the defect in the evidence. [Citations.]" (*People* v. *Mattson, supra,* 50 Cal.3d at p. 854.) "*Miranda*-based claims are governed by this rule. 'The general rule is that a defendant must make a specific objection on *Miranda* grounds at the trial level in order to raise a *Miranda* claim on appeal.'" (*Ibid.,* quoting *People* v. *Milner* (1988) 45 Cal.3d 227, 236 [246 Cal.Rptr. 713, 753 P.2d 669] [pretrial motion was not pursued to obtain a ruling]; *People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048]; see also *People* v. *Visciotti* (1992) 2 Cal.4th 1, 54 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People* v. *Kelly* (1992) 1 Cal.4th 495, 519 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

▇▇▇ In addition, we have held that a pretrial ruling on a claimed violation of a defendant's Fifth Amendment rights is subject to reconsideration by the trial court, and an objection on Fifth Amendment grounds to the admissibility of the evidence is waived if not made at trial when the evidence is offered. (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1005 [254 Cal.Rptr. 586, 766 P.2d 1]; cf. *People* v. *Jennings* (1988) 46 Cal.3d 963, 975-976 [251 Cal.Rptr. 278, 760 P.2d 475] [issue preserved through stipulation that earlier ruling would be binding at new trial]; *People* v. *Boyer* (1989) 48 Cal.3d 247, 270-271, fn. 13 [256 Cal.Rptr. 96, 768 P.2d 610]

---

[6]The conversation between the court and counsel was as follows: "The court: I take it he doesn't want anything in. [¶] [Defense counsel]: That's right. [¶] [Prosecutor]: We already ruled on that, though. I mean—[¶] The court: No, I haven't ruled on these statements, have I? [Prosecutor]: Judge Gilbert did. [¶] The court: Oh. [¶] [Defense counsel]: Judge Gilbert did. [¶] [Prosecutor]: We had a motion to throw this statement out. [¶] [Defense counsel]: But Judge Gilbert did in the context—[¶] The court: The Miranda admissibility—he ruled that Miranda does not prohibit these from coming in. The next question is what is relevant in these statements and should they be sanitized. [¶] [Defense counsel]: Yes. That's correct."

[issue preserved because *Miranda* claim tied to binding ruling, pursuant to § 1538.5, that no detention occurred, so that objection at trial would have been futile].)

 Nonetheless, in *People* v. *Morris*, *supra*, 53 Cal.3d 152, 189-190, we concluded that if a motion to exclude evidence is made raising a specific objection, directed to a particular, identifiable body of evidence, at the beginning of or during trial at a time when the trial judge can determine the evidentiary question in its appropriate context, the issue is preserved for appeal without the need for a further objection at the time the evidence is sought to be introduced. In the present case, all three criteria are met, although the motion was made prior to trial. Moreover, as was the case in *Morris*, no event occurred after the *in limine* ruling and before the evidence was received at trial "that so changed the context as to constitute a basis for reconsideration of the ruling." (*Id.* at p. 189.)

In addition, in *People* v. *Wharton* (1991) 53 Cal.3d 522, 549-550 [280 Cal.Rptr. 631, 809 P.2d 290], we relied upon *Morris* to conclude that, because the three criteria outlined in *Morris* were met, the defendant had not waived the issue in question for purposes of appeal where, in a *pretrial* motion, the defendant had moved to exclude evidence based upon the psychotherapist-patient privilege and did not object at trial to admission of the evidence on that ground. Further, in *People* v. *Clark* (1992) 3 Cal.4th 41 [10 Cal.Rptr.2d 554, 833 P.2d 561], we considered whether the defendant, having made a motion and having obtained a hearing pretrial on the issue whether to exclude his statements pursuant to *Miranda*, was entitled to another hearing on the *Miranda* issue during the trial. We concluded the defendant was not entitled to a second hearing, based in part upon the reasoning of *Morris* that such *in limine* hearings concerning the admissibility of evidence should be conducted separately, prior to the introduction of evidence at trial. (*Id.* at p. 119.)

In the present case, the comments of the Placer County judge suggest he considered the ruling of the earlier judge to be binding. Moreover, it would appear inconsistent to require that defendant renew his objection to such evidence at trial or lose his right to raise the issue on appeal, while concluding, nevertheless, that he is not entitled to any further hearing on the objection. (See *People* v. *Clark*, *supra*, 3 Cal.4th at p. 119.) Because we have held a defendant is not obligated to renew a pretrial motion that is based upon a statutory privilege, it would be anomalous to subject a defendant raising a claim arising under the Constitution to a different rule. Accordingly, we conclude defendant preserved this issue for appeal.

### 2. *Whether defendant invoked his Miranda rights*

■ We recently have observed that " '[t]he scope of our review of constitutional claims of this nature is well established. We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly. found by the trial court, whether the challenged statement was illegally obtained. [Citation.]' " (*People* v. *Johnson* (1993) 6 Cal.4th 1, 25 [23 Cal.Rptr.2d 593, 859 P.2d 673]; *People* v. *Boyer, supra,* 48 Cal.3d 247, 263.)

■ As we stated in *People* v. *Sims* (1993) 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992], "[u]nder the familiar requirements of *Miranda,* designed to assure protection of the federal Constitution's Fifth Amendment privilege against self-incrimination under 'inherently coercive' circumstances, a suspect may not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and to appointed counsel in the event the suspect is indigent." (Citing *Miranda* v. *Arizona, supra,* 384 U.S. 436, 444-445, 473-474 [16 L.Ed.2d 694, 706-707, 722-723].) "Once having invoked these rights, the accused 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.' " (5 Cal.4th at p. 440, citing *Edwards* v. *Arizona* (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 385-386, 101 S.Ct. 1880]; see also *McNeil* v. *Wisconsin* (1990) 501 U.S. 171, 176-177 [115 L.Ed.2d 158, 167-168, 111 S.Ct. 2204]; *Arizona* v. *Roberson* (1988) 486 U.S. 675, 680-682 [100 L.Ed.2d 704, 712-714, 108 S.Ct. 2093]; *Michigan* v. *Mosley* (1975) 423 U.S. 96, 104, fn. 10 [46 L.Ed.2d 313, 321, 96 S.Ct. 321].) If, subsequently, assuming there is no break in custody, the police initiate a meeting in the absence of counsel, the suspect's statements are presumed involuntary and are inadmissible as substantive evidence at trial, even if the suspect executes a waiver and the statements would be considered voluntary under traditional standards. (*McNeil* v. *Wisconsin, supra,* 501 U.S. 171, 176-177 [115 L.Ed.2d 158, 167-168]; see *Michigan* v. *Harvey* (1990) 494 U.S. 344, 350 [108 L.Ed.2d 293, 302, 110 S.Ct. 1176].)

If a suspect indicates "in any manner and *at any stage of the process,*" *prior to* or during questioning, that he or she wishes to consult with an attorney, the defendant may not be interrogated. (*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 444-445 [16 L.Ed.2d at pp. 706-707], italics added; *id.* at pp. 470, 472-474, 477-479 [16 L.Ed.2d at pp. 721, 722-724, 725-727]; *People* v. *Burton* (1971) 6 Cal.3d 375, 383-384 [99 Cal.Rptr. 1, 491 P.2d 793]; see

*People* v. *Johnson, supra*, 6 Cal.4th 1, 27; *People* v. *Boyer, supra*, 48 Cal.3d 247, 271.)

We have observed previously that no particular form of words or conduct is necessary on the part of a suspect in order to invoke his or her right to remain silent (*People* v. *Randall* (1970) 1 Cal.3d 948, 955 [83 Cal.Rptr. 658, 464 P.2d 114]), and the suspect may invoke this right by any words or conduct reasonably inconsistent with a present willingness to discuss the case freely and completely. (*People* v. *Burton, supra*, 6 Cal.3d 375, 382.) Earlier decisions of this court and the Courts of Appeal have indicated that a request for counsel need not be unequivocal in order to preclude questioning by the police. (See *People* v. *Clark* (1993) 5 Cal.4th 950, 990 [22 Cal.Rptr.2d 689, 857 P.2d 1099]; *People* v. *Thompson* (1990) 50 Cal.3d 134, 165 [266 Cal.Rptr. 309, 785 P.2d 857]; *People* v. *Randall, supra*, 1 Cal.3d 948, 955.) As we stated in *People* v. *Johnson, supra*, 6 Cal.4th 1, 27-28, California decisions have concluded that a defendant may invoke the constitutional right to counsel by such diverse statements or questions as: " 'Do you think we need an attorney?' " and " 'I guess we need a lawyer' " (*People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 735-736 [125 Cal.Rptr. 798, 542 P.2d 1390]); " 'Tell me the truth, wouldn't it be best if I had an attorney with me?' " (*People* v. *Hinds* (1984) 154 Cal.App.3d 222, 234 [201 Cal.Rptr. 104]); " 'I don't know if I should have a lawyer here or what . . . .' " (*People* v. *Russo* (1983) 148 Cal.App.3d 1172, 1176-1177 [196 Cal.Rptr. 466]); and " 'Well, maybe I should talk to my attorney, Mr. Corbin' " (*People* v. *Munoz* (1978) 83 Cal.App.3d 993, 995-996 [148 Cal.Rptr. 165]). ■ Defendant relies upon these and similar California decisions in contending that the trial court erred in admitting evidence of his statements to the police.

■ Nonetheless, as we previously have recognized, subsequent to the adoption of article I, section 28, subdivision (d) of the California Constitution, we apply federal standards in reviewing a defendant's claim that his or her statements were elicited in violation of *Miranda*. (*People* v. *Sims, supra*, 5 Cal.4th 405, 440; *People* v. *Markham* (1989) 49 Cal.3d 63, 67-71 [260 Cal.Rptr. 273, 775 P.2d 1042].) Subsequent to its decision in *Edwards*, the United States Supreme Court observed that "[t]he rule of [*Edwards*] applies only when the suspect 'ha[s] expressed' his wish for the particular sort of lawyerly assistance that is the subject of *Miranda*. [Citation.] It requires, at a minimum, some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." (*McNeil* v. *Wisconsin, supra*, 501 U.S. 171, 178 [115 L.Ed.2d 158, 168-169], italics omitted.)

Most recently, in *Davis* v. *United States* (1994) 512 U.S. __, __ [129 L.Ed.2d 362, 368, 114 S.Ct. 2350], in determining that a suspect's remark to

Naval Investigative Service agents—"Maybe I should talk to a lawyer"—was *not* a request for counsel, the United States Supreme Court has held further that a suspect must *unambiguously* request counsel. (512 U.S. at p. __ [129 L.Ed.2d at p. 371].) The court in that case stated: "As we have observed, 'a statement either is such an assertion of the right to counsel or it is not.' *Smith* v. *Illinois* [(1984)] 469 U.S. 91, 97-98. . . . Although a suspect need not 'speak with the discrimination of an Oxford don[ ]' . . . (Souter, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect. See *Moran* v. *Burbine* 475 U.S. 412, 43, n. 4, 89 L.Ed.2d 410, 106 S.Ct. 1135 (1986) ('the interrogation must cease until an attorney is present *only* [i]f the individual states that he wants an attorney') . . . . [¶] We decline petitioner's invitation to extend *Edwards* and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. See *Arizona* v. *Roberson,* [486 U.S. 675,] 688 . . . (Kennedy, J., dissenting) ('the rule of *Edwards* is our rule, not a constitutional command; and it is our obligation to justify its expansion')." (*Davis* v. *United States, supra,* 512 U.S. __, __ [129 L.Ed.2d 362, 371-372].) "[W]e are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer. Unless the suspect actually requests an attorney, questioning may continue." (512 U.S. at p. __ [129 L.Ed.2d at p. 373].)

▮▮▮▮▮ In the present case, defendant did not unequivocally state that he wanted an attorney, but simply asked a question. Moreover, he declined to respond when the police repeated the advisement that he was entitled to an attorney. (See *People* v. *Johnson, supra,* 6 Cal.4th 1, 29; *People* v. *Clark, supra,* 3 Cal.4th 41, 121.)[7] Viewed in context, defendant's statement simply indicated defendant wished to ascertain whether he had heard the officer correctly. Upon being informed that he had heard correctly, defendant did not make a statement "that can reasonably be construed to be an expression

---

[7]In *Davis* v. *United States, supra,* 512 U.S. __ [129 L.Ed.2d 362], the high court also indicated that, although the police *may* seek to clarify a suspect's ambiguous reference to counsel, they are not required to do so. (*Id.* at p. __ [129 L.Ed.2d at p. 373]; cf. *People* v. *Johnson, supra,* 6 Cal.4th 1, 27 [if a suspect "expresses ambiguous remarks falling short of a clear waiver or invocation of his *Miranda* rights," officers may "continue talking with him for the limited purpose of clarifying whether he is waiving or invoking those rights"]; *People* v. *Clark, supra,* 5 Cal.4th 950, 991.) In the present case, the officer responded to defendant's question by repeating that defendant could have an attorney "if he wanted one." This repetition tended to "open the door" to an assertion of that right (see *People* v. *Johnson, supra,* 6 Cal.4th 1, 28-30), but defendant did not respond.

of a desire for the assistance of an attorney in dealing with custodial interrogation by the police" (*McNeil* v. *Wisconsin, supra,* 501 U.S. 171, 178 [115 L.Ed.2d 158, 169], italics omitted; see *Davis* v. *United States, supra,* 512 U.S. __, __ [129 L.Ed.2d 362, 371-372]), but merely remained silent.

We conclude that, in view of the entire record—including defendant's statements and his disruptive conduct as a whole during and immediately following the arrest (which apparently contributed to his failure to hear completely the officer's initial advisements), the interrogatory nature of defendant's reference to an attorney, the officer's immediate repetition of the advice that had been given, and defendant's failure to respond thereto— there was substantial evidence to support the trial court's determination that defendant's statement did not constitute an invocation of his right to counsel. Therefore, it is unnecessary for us to determine whether the evidence obtained in asserted violation of *Miranda* was prejudicial to the defense.[8]

## B. *Admissibility of photographs of victims*

Defendant contends the trial court erred in admitting into evidence 24 photographs (22 of which were enlarged to 8 inches by 10 inches) of the bodies of Katherine and William Chiapella. The photographs include views of the victims' bodies at the respective locations they were discovered, their bludgeoned faces and heads, Katherine's partially unclothed body with a knife protruding from it and her purse with its contents spilled out nearby, William's body covered by blood-soaked clothes, William's body with the

---

[8]In addition, a review of those California decisions based upon the previous rule that even equivocal statements may constitute an invocation of a defendant's constitutional rights— decisions upon which defendant relies in attempting to establish that an invocation occurred in the present case—reveals that in those cases various factors indicative of an invocation were present and that none of those factors are present here. (Cf. *People* v. *Superior Court (Zolnay), supra,* 15 Cal.3d 729, 735-736 [equivocal statements were a direct result of interrogation that had reached the stage where suspects' choices appeared limited to confession or silence, and suspects requested a specific recommendation as to counsel]; *People* v. *Hinds, supra,* 154 Cal.App.3d 222, 230, 234-235 [while interrogation was in progress, suspect had to request that he be advised of his *Miranda* rights, and the officer spoke "softly and indistinctly," without inquiring as to suspect's understanding or waiver prior to suspect's questioning the officer whether it would be best if an attorney were present]; *People* v. *Munoz, supra,* 83 Cal.App.3d 993, 995-996 [at commencement of interrogation, suspect named his attorney in commenting that perhaps he should speak to counsel].) In other cases cited by defendant, the statements indicate the suspect's *belief* an attorney should be present (see, e.g., *People* v. *Pack* (1988) 201 Cal.App.3d 679, 690 [248 Cal.Rptr. 240] [" 'I think you ought to have somebody protecting me right now . . . .' "]; *People* v. *Duran* (1983) 140 Cal.App.3d 485, 490-492 [189 Cal.Rptr. 595] [" 'Well then I think it's better that I have an attorney here,' and 'have you got an attorney right here present, close?' "]), or at least the suspect's *contemplating* whether an attorney should be present (see, e.g., *People* v. *Russo, supra,* 148 Cal.App.3d 1172, 1176-1177 [" 'I don't know if I should have a lawyer here or what . . . .' "]).

knife recovered from inside it held next to the body, and views of tightly bound wrists and blackened fingernails. Several photographs taken prior to autopsy show portions of the unclad bodies with wounds that had been cleansed, and two black and white autopsy photographs depict traumatic head injuries.

The defense moved *in limine* to exclude these photographs on grounds of their lack of relevance, cumulative character, and prejudicial effect. (Evid. Code, §§ 350, 352.) The trial court, hearing defense arguments with respect to each of the photographs, considered these three bases for objection as to each photograph and overruled each objection. Later during trial, after argument by counsel and comment by the court, the court admitted the 24 photographs.

### 1. *Alleged lack of relevance*

In determining the admissibility of the photographic evidence, we apply well-established rules. **(17)** Only relevant evidence is admissible (Evid. Code, § 350; *People* v. *Garceau, supra,* 6 Cal.4th 140, 176-177; *People* v. *Babbitt* (1988) 45 Cal.3d 660, 681 [248 Cal.Rptr. 69, 755 P.2d 253]), and, except as otherwise provided by statute, all relevant evidence is admissible (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d).) Relevant evidence, defined in Evidence Code section 210 as evidence " 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action,' " tends " 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" (*People* v. *Garceau, supra,* 6 Cal.4th 140, 177.) The trial court has broad discretion in determining the relevance of evidence (*ibid.; People* v. *Babbitt, supra,* 45 Cal.3d 660, 681), but lacks discretion to admit irrelevant evidence. (*Ibid.; People* v. *Burgener* (1986) 41 Cal.3d 505, 527 [224 Cal.Rptr. 112, 714 P.2d 1251].)

Defendant contends the photographs of the victims were wholly irrelevant because they were probative only of matters that were not in dispute. (See *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1137 [240 Cal.Rptr. 585, 742 P.2d 1306].) The circumstance that defendant did not contest the testimony of the medical examiner and others who located and examined the bodies, however, did not render the photographs irrelevant; rather, the photographic exhibits served to clarify that testimony. (*People* v. *Thomas* (1992) 2 Cal.4th 489, 524 [7 Cal.Rptr.2d 199, 828 P.2d 101].)

The prosecution tried the first degree murder charges on the theories that the murders were premeditated or committed in the course of a robbery, and

that the murder of William involved torture. The photographs depicting the various knife wounds and blunt trauma to the bodies were relevant to establish the manner in which the victims were killed, including the nature and placement of the victims' wounds. (See *People* v. *Wilson* (1992) 3 Cal.4th 926, 938 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; *People* v. *Pride, supra*, 3 Cal.4th 195, 243; *People* v. *Anderson, supra*, 43 Cal.3d 1104, 1137.) The photographs of the location and condition of the bodies, including the manner in which the victims were bound and gagged, also were relevant to the issue of premeditation and deliberation. (*People* v. *Garceau, supra*, 6 Cal.4th 140, 180-181; *People* v. *Clair, supra*, 2 Cal.4th 629, 660; *People* v. *Hendricks* (1987) 43 Cal.3d 584, 594 [238 Cal.Rptr. 66, 737 P.2d 1350].) In addition, the nature of the nonfatal wounds inflicted upon William, as well as his facial expression, as shown in the photographs, were relevant to demonstrate the perpetrator's intent to cause the cruel suffering necessary to establish that the murder involved torture. (See *People* v. *Raley, supra*, 2 Cal.4th 870, 896-897.)

The prosecutor " 'was not obliged to prove these details solely from the testimony of live witnesses' [citation] or to accept antiseptic stipulations in lieu of photographic evidence. '[T]he jury was entitled to see how the physical details of the scene and the bod[ies] supported the prosecution theory of [first degree murder].' " (*People* v. *Pride, supra*, 3 Cal.4th 195, 243.) For the same reason, the evidence thereby provided was relevant as to aggravation of the crimes and the appropriate penalty. (*People* v. *Cox* (1991) 53 Cal.3d 618, 666 [280 Cal.Rptr. 692, 809 P.2d 351]; *People* v. *Sanders, supra*, 51 Cal.3d 471, 514.)

2. *Evidence Code section 352*

a. *Alleged undue prejudice*

▮ Defendant contends that even if these photographs were relevant, the trial court committed reversible error in failing to exclude them as unduly prejudicial pursuant to Evidence Code section 352.[9]

▮ The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. (*People* v. *Wilson, supra,* 3 Cal.4th 926, 938; *People* v. *Price* (1991) 1 Cal.4th 324, 441 [3 Cal.Rptr.2d 106, 821 P.2d

---

[9]Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create the substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

610].] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. (*People* v. *Wilson, supra,* 3 Cal.4th 926, 938; *People* v. *Mickey, supra,* 54 Cal.3d 612, 655-656; *People* v. *Sanders, supra,* 51 Cal.3d 471, 514; *People* v. *Mason, supra,* 52 Cal.3d 909, 944.)

 The photographs showing the victims' wounds, including the two autopsy photographs, were highly probative as to the kind and degree of force used on the victims, indicative of malice, and, in William's case, to establish the intent to cause cruel suffering and the causation of extreme pain. The photographs depicting the thoroughness with which the victims had been bound were highly probative of, among other issues, the planning and deliberation with which the offenses were executed, because they tended to establish that defendant took great care to render his victims helpless, having brought from his own apartment a pillowcase from which he fashioned the bindings. Similarly, the photographs of the locations and positions of the bodies were highly demonstrative of premeditation and deliberation, establishing, for example, that defendant had separated the two victims and had moved William to the bedroom before killing him. The photographs helped illustrate and corroborate the testimony supplied by Dr. Hall, testimony that provided the factual bases upon which the prosecutor established the foregoing and other relevant matters.

The probative value of the photographs was not clearly outweighed by their prejudicial effect. We have described the "prejudice" referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. (*People* v. *Garceau, supra,* 6 Cal.4th 140, 178.) As we previously have observed, victim photographs and other graphic items of evidence in murder cases always are disturbing. (*People* v. *Hendricks, supra,* 43 Cal.3d 584, 594.) Our independent review of the photographs convinces us that, although the photographs are unpleasant, they are not unduly shocking or inflammatory. Nor do they include multiple exposures of very similar views. (*People* v. *Wilson, supra,* 3 Cal.4th 926, 938.) We conclude that, in admitting the photographs, the trial court did not abuse its discretion under Evidence Code section 352, because it reasonably could determine that the probative value of the photographs outweighed their potentially prejudicial effect. (*People* v. *Wilson, supra,* 3 Cal.4th at p. 938; *People* v. *Mickey, supra,* 54 Cal.3d 612, 656; *People* v. *Cox, supra,* 53 Cal.3d 618, 666; *People* v. *Benson* (1990) 52 Cal.3d 754, 786 [276 Cal.Rptr. 827, 802 P.2d 330].)

Defendant also contends the photographs merely were cumulative. We often have rejected the contention that photographs of a murder victim must

be excluded as cumulative simply because testimony also has been introduced to prove the facts that the photographs are intended to establish. (See, e.g., *People* v. *Wilson, supra,* 3 Cal.4th 926, 938; *People* v. *Raley, supra,* 2 Cal.4th 870, 897; *People* v. *Thomas, supra,* 2 Cal.4th 489, 524; *People* v. *Price, supra,* 1 Cal.4th 324, 441.)[10]

 b. *The trial court's alleged failure to demonstrate that it weighed probative value against prejudicial effect*

Defendant contends the trial court erred in failing to state on the record that, in admitting the photographs in question, it had weighed prejudice against probative value. When a defendant objects to evidence pursuant to Evidence Code section 352, the record must demonstrate affirmatively that the trial court did in fact weigh prejudice against probative value. (*People* v. *Clair, supra,* 2 Cal.4th 629, 660; *People* v. *Mickey, supra,* 54 Cal.3d 612, 656; *People* v. *Edelbacher, supra,* 47 Cal.3d 983, 1016-1017.) Nonetheless, " 'the trial judge need not *expressly* weigh prejudice against probative value—or even *expressly* state that he has done so.' " (*People* v. *Clair, supra,* 2 Cal.4th 629, 660, italics added; *People* v. *Mickey, supra,* 54 Cal.3d 612, 656; see *People* v. *Raley, supra,* 2 Cal.4th 870, 897.)

We do not perceive any error in the trial court's failure to provide detailed and precise descriptions of the weighing process it engaged in as to each photograph, pursuant to Evidence Code section 352. At the time of the pretrial motion *in limine* by which defendant sought to exclude this evidence, the prosecutor, as each photograph was reviewed, in most instances described what each depicted, frequently offering an explanation linking the subject of a particular photograph with relevant testimony. Prior to the trial court's *in limine* ruling, the prosecutor elaborated on the justifications for admitting the several categories of photographs. As noted above, the trial court heard defense argument as to each photograph, clearly was made aware of defendant's contentions as to the arguably prejudicial nature of each photograph, and knew it was required to engage in the weighing process required by Evidence Code section 352. (See *People* v. *Garceau, supra,* 6 Cal.4th 140, 178-179; *People* v. *Raley, supra,* 2 Cal.4th 870, 897; *People* v. *Edelbacher, supra,* 47 Cal.3d 983, 1016-1017.)

---

[10]On appeal, defendant also asserts that introduction of the photographs violated his right to a reliable penalty determination pursuant to the Eighth and Fourteenth Amendments to the United States Constitution. At trial, defendant failed to object based upon any federal constitutional provision. Therefore, this claim is waived. (See *People* v. *Clair, supra,* 2 Cal.4th 629, 661, fn. 6; *People* v. *Benson, supra,* 52 Cal.3d 754, 786, fn. 7.) Nonetheless, even if the claim had been made in the trial court, we would find no federal constitutional error, in view of our determination that the photographs properly were admitted in evidence. (*People* v. *Hardy* (1992) 2 Cal.4th 86, 199 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

During the course of the *in limine* review, the court also excluded a photograph that nearly duplicated another photograph depicting Katherine at the crime scene, ordered several other photographs withdrawn, ordered that the two autopsy photographs as well as the photograph of William's face be presented in black and white, and, for example, ordered that a photograph be cropped to illustrate wounds inflicted upon William's body without also showing his face. Several other photographs that apparently depicted the wounds in more graphic detail were withdrawn by the prosecutor. (See *People* v. *Cox*, *supra*, 53 Cal.3d 618, 666.)[11]

In addition, at the time defendant moved to strike the photographs before their introduction into evidence, the trial court commented on five of the photographs, generally indicating why it had determined that these were not unduly prejudicial. In one instance, the court excluded a view of Katherine it earlier had allowed in evidence, and excluded several new photographs offered by the prosecutor, because they were duplicative of one of the photographs earlier submitted. The record, including the comments of the trial court, sufficiently establishes that the court weighed the probative value of each photograph against its potentially prejudicial effect, and considered and rejected the arguments of defense counsel. (*People* v. *Clair*, *supra*, 2 Cal.4th 629, 660; *People* v. *Edelbacher*, *supra*, 47 Cal.3d 983, 1016-1017.)

## C. *Torture-murder special-circumstance issues*

### 1. *Denial of pretrial motion to set aside torture-murder special circumstance*

Defendant, maintaining that the evidence presented at the preliminary hearing was insufficient to establish that the murder of William involved torture, contends the trial court erred in denying his pretrial motion (pursuant to section 995) to set aside the allegation of the torture special circumstance.[12]

First, we disagree with defendant's claim that the evidence presented at the preliminary hearing as to the nonfatal injuries indicative of torture did not supply probable cause to hold defendant to answer as to that allegation.

Second, even an erroneous denial of a section 995 motion justifies reversal of a judgment of conviction only when a defendant is able to demonstrate

---

[11]It appears that one photograph depicting the neck bindings and the back of Katherine's head, originally withdrawn by the prosecutor, later was admitted into evidence over defendant's objection. This photograph was relevant but not cumulative; nor was it substantially more prejudicial than probative.

[12]Defendant filed his motion on March 25, 1988, more than 60 days following his arraignment on September 22, 1987, and therefore was not entitled to pretrial review by writ (§ 1510.)

prejudice at trial flowing from the purportedly inadequate evidentiary show-ing at the preliminary hearing. (*People* v. *Alcala* (1984) 36 Cal.3d 604, 627-628 [205 Cal.Rptr. 775, 685 P.2d 1126]; *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941].) Defendant has not made such a showing here. Where the evidence produced at trial amply supports the jury's finding, any question whether the evidence produced at the preliminary hearing supported the finding of probable cause is rendered moot. Even " ' "[i]f there is insufficient evidence to support the commitment, the defendant cannot be said to be prejudiced where sufficient evidence has been introduced at . . . trial" ' " to support the jury's finding as to the charge or as to the truth of the allegation. (*People* v. *Moreno* (1984) 158 Cal.App.3d 109, 114 [204 Cal.Rptr. 17]; *People* v. *Moore* (1987) 185 Cal.App.3d 1005, 1017-1018 [230 Cal.Rptr. 237]; *People* v. *Hunt* (1982) 133 Cal.App.3d 543, 552-553 [184 Cal.Rptr. 197]; *People* v. *Fagalilo* (1981) 123 Cal.App.3d 524, 532 , fn. 3 [176 Cal.Rptr. 698]; *People* v. *Hampton* (1981) 116 Cal.App.3d 193, 199 [172 Cal.Rptr. 25]; *People* v. *Chambers* (1980) 108 Cal.App.3d 985, 991 [166 Cal.Rptr. 815].) Therefore, because, as discussed, *post*, the evidence received at trial is sufficient to support the finding that the alleged special circumstance of murder involving torture was true, defendant's contention with regard to the section 995 motion is without merit.

 2. *Alleged instructional error as to burden of proof of torture special circumstance*

 Defendant contends the trial court erred in instructing the jury as to the elements of the torture-murder special circumstance. Specifically, defend-ant contends the trial court did not instruct the jury it must find that defendant *did in fact* inflict extreme, cruel, physical pain and suffering upon a living human being, because, in *orally* instructing the jury according to a modified version of CALJIC No. 8.81.18 offered by defendant, the court stated that "*If* Mr. Crittenden did in fact inflict extreme, cruel, physical pain and suffering upon a living human being no matter how long its duration, awareness of pain by the deceased is not a necessary element of torture." (Italics added.)

 The written version of the instruction provided by the trial court informed the jury as follows: "To find that the special circumstance, referred to in these instructions as murder involving infliction of torture, is true, each of the following facts must be proved beyond a reasonable doubt: [¶] 1. Mr. Crittenden intended to, and did kill a human being. [¶] 2. The killing did constitute murder in the first degree. [¶] 3. Separate and independent from the intent to kill, Mr. Crittenden also had the specific intent to torture the victim. [¶] 4. In this regard the intent to torture means a specific intent to

inflict extreme and prolonged pain upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose. [¶] 5. Further, the specific intent to torture must be established beyond a reasonable doubt to have been a willful, deliberate and premeditated intent to inflict extreme and prolonged pain. In this regard, the word willful means intentional. The word deliberate means formed or arrived at as a result of careful thought and weighing the considerations for and against the proposed course of action. The word premeditated means considered beforehand. [¶] 6. *Mr. Crittenden did in fact inflict extreme, cruel, physical pain and suffering upon a living human being no matter how long its duration. Awareness of pain by the deceased is not a necessary element of torture.*" (Italics added.)

As noted, in reading the instruction to the jury, the trial court added the word "if" before the italicized passage. The trial court's inadvertent misreading of the instruction does not appear to be error, because no reasonable juror would have understood the instruction to relieve the jury of the necessity of making a determination that defendant did in fact inflict extreme, cruel, physical pain and suffering upon William. First, the oral instruction did not, as suggested by defendant, *omit* the element that defendant did in fact inflict extreme, cruel, physical pain and suffering upon a living human being, but indicated, rather, that *if* the jury found that fact, awareness of pain was not an element of torture.

Second, the jury received the correct (as modified by defendant) version of CALJIC No. 8.81.18 in its written form. (See *People* v. *Garceau, supra,* 6 Cal.4th 140, 189-190 [trial court's omission of portion of CALJIC No. 3.19 held harmless because jurors received correct instruction in written form]; *People* v. *Andrews* (1989) 49 Cal.3d 200, 215-216 [260 Cal.Rptr. 583, 776 P.2d 285]; *People* v. *Heishman* (1988) 45 Cal.3d 147, 163-165 [246 Cal.Rptr. 673, 753 P.2d 629]; see also *People* v. *McLain* (1988) 46 Cal.3d 97, 111, fn. 2 [249 Cal.Rptr. 630, 757 P.2d 569] [presumption jurors were guided by written version of instructions].) The oral and written rendering of the instruction also specifically advised the jury that specific intent to inflict extreme pain was an element of the special circumstance.

In addition, we may consider whether, in light of the argument of counsel, the trial court's slight misreading of the instruction could have been prejudicial. (See *People* v. *Webster* (1991) 54 Cal.3d 411, 451-452 [285 Cal.Rptr. 31, 814 P.2d 1273] [whether prosecutor's argument exploited possible ambiguities in instructions]; *People* v. *Howard* (1988) 44 Cal.3d 375, 435-436 [243 Cal.Rptr. 842, 749 P.2d 279]; cf. *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1254-1255 [278 Cal.Rptr. 640, 805 P.2d 899] [neither counsel discussed issue that was inadequately addressed in instruction].) In the present

case, during closing argument, the prosecutor stated: "Finally, the jury has to find that Mr. Crittenden *did, in fact, inflict extreme cruel physical pain and suffering upon a living human being* no matter how long its duration and that awareness of the pain by the victim is not a necessary element of the torture." (Italics added.) The prosecutor also emphasized the evidence tending to demonstrate that William did suffer extreme pain from the neck and back injuries. Rather than exacerbating the trial court's misreading, this argument served to reinforce the correct written version of the instruction. We conclude any error was nonprejudicial. (Cal. Const., art. VI, § 13.)

### 3. Sufficiency of evidence of torture

Defendant appears to contend that the trial court erred in submitting to the jury, over defense objection, the special circumstance allegation that William's murder involved the infliction of torture, and to contend that the evidence is insufficient to support the jury's finding of the truth of that special circumstance. Although defendant was rendered death-eligible by the jury's having found true the other alleged special circumstances, and therefore the presence or absence of the torture special circumstance would have impact only upon the penalty phase, we proceed at this juncture to review the sufficiency of the evidence supporting that special circumstance finding.

"In reviewing a challenge to the sufficiency of evidence, the reviewing court must determine from the entire record whether a reasonable trier of fact could have found that the prosecution sustained its burden of proof beyond a reasonable doubt. In making this determination, the reviewing court must consider the evidence in a light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment. The test is whether substantial evidence supports the [conclusion of the trier of fact], not whether the evidence proves guilt beyond a reasonable doubt." (*People* v. *Mincey, supra*, 2 Cal.4th 408, 432, citing *People* v. *Hayes* (1990) 52 Cal.3d 577, 631 [276 Cal.Rptr. 874, 802 P.2d 376]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 575-577 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)[13]

---

[13]The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." (*People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1022 [248 Cal.Rptr. 568, 755 P.2d 1017]; see *People* v. *Mincey, supra*, 2 Cal.4th 408, 432, fn. 2.)

### a. *Evidence of infliction of extreme pain*

 Defendant urges that the prosecution failed to produce evidence demonstrating that the five wounds claimed to have been torturous would have caused William extreme pain. We have observed: "Section 190.2, subdivision (a)(18), provides a special circumstance if '[t]he murder was intentional and involved the infliction of torture. For the purpose of this section torture requires proof of the infliction of *extreme physical pain* no matter how long its duration.' " (*People* v. *Wade* (1988) 44 Cal.3d 975, 993 [244 Cal.Rptr. 905, 750 P.2d 794], italics added; see *People* v. *Davenport* (1985) 41 Cal.3d 247, 271 [221 Cal.Rptr. 794, 710 P.2d 861].)[14]

In the present case, during argument to the jury, the prosecutor relied upon the presence of the three knife injuries to the front of William's neck and the two injuries to his lower back to establish that William's murder involved torture. The forensic pathologist testified that each of these injuries, in addition to the other injuries (with the exception of the exit wound of the knife), would have caused William pain, but she did not testify expressly that William suffered *extreme* pain. Nonetheless, the forensic pathologist's testimony, considered with the photographs of the injuries themselves and of William's facial expression, amply support the determination that William suffered extreme pain. The jury instruction on this special circumstance referred to the infliction of "extreme, cruel, physical pain," and it is clear a reasonable jury could determine that the cumulative pain caused by the successive premortem injuries, *including* these particular injuries, caused William to suffer extreme pain beyond the pain involved in incurring mortal wounds. (See *People* v. *Raley, supra,* 2 Cal.4th 870, 889.)

### b. *Evidence of intent to torture*

**(26)** Defendant contends the evidence is insufficient to demonstrate that defendant *intended* to cause William extreme pain. Defendant relies upon the claim, frequently asserted in the context of first degree murder by torture, that the only evidence of intent to torture was derived from the condition of the victim's body, and that the severity of the victim's wounds is not necessarily determinative of intent to torture, because even the presence of severe wounds may be as consistent with "an explosion of violence" as with torture. (See *People* v. *Raley, supra,* 2 Cal.4th 870, 888; *People* v. *Mincey, supra,* 2 Cal.4th 408, 432; *People* v. *Davenport, supra,* 41 Cal.3d 247, 268.)

---

[14]Proposition 115, passed by the California electorate on June 6, 1990, amended section 190.2, subdivision (a)(18) (torture special circumstance), to delete the requirement of proof that a defendant inflicted *extreme* physical pain on the victim. Because the offenses herein were committed in January 1987, the applicable standard is the version of section 190.2, subdivision (a)(18), predating Proposition 115.

As we have observed in evaluating similar claims made in the context of challenges to convictions for first degree murder by torture, intent is a state of mind which, unless established by the defendant's own statements (or by another witness's description of a defendant's behavior in committing the offenses), must be proved by the circumstances surrounding the commission of the offense (*People* v. *Proctor* (1992) 4 Cal.4th 499, 531 [15 Cal.Rptr.2d 340, 842 P.2d 1100], affd. in *Tuilaepa* v. *California* (1994) 512 U.S. __ [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People* v. *Mincey, supra*, 2 Cal.4th 408, 433; *People* v. *Pensinger, supra*, 52 Cal.3d 1210, 1239), which include the nature and severity of the victim's wounds. (*People* v. *Mincey, supra*, 2 Cal.4th 408, 433.)

In the present case, the totality of the circumstances of the crime amply demonstrates defendant's intent to torture William and suggests neither an "explosion of violence," nor, in the case of the nonfatal wounds, inadvertent infliction. The careful, even excessive, binding and gagging of the victims, involving a considerable expenditure of time and effort, such as occurred in the present case, generally is inconsistent with the theory that an "explosion of violence" occurred. William, having been so thoroughly incapacitated as to be unable to offer even the slightest resistance, and having been moved at some point, still bound to the chair, from the study into the bedroom, suffered several neck injuries (including puncture wounds and a longer, cutting wound) and back injuries (consisting of puncture wounds) caused by the knife. A number of these were fairly superficial cuts that clearly were not intended to be lethal (as appeared also to be the case with regard to William's fractured lower jaw), but apparently were meant instead to persuade Katherine to execute a check payable to defendant. At the same time, given their nature and placement, these wounds could not have been inflicted inadvertently. All of them appear to have preceded the fatal chest injury and head injuries. These nonfatal injuries are consistent only with an intent to inflict extreme pain, and provide substantial evidence supporting the determination that this element of the special circumstance was proved.

### c. *Causal relationship between torture and death*

■ Defendant contends the prosecution failed to establish a causal relationship between the acts of torture and death. (See *People* v. *Bittaker, supra*, 48 Cal.3d 1046, 1101-1102 [declining to decide the issue].) Defendant is mistaken as to the nature of the proof necessary to establish the presence of torture so as to justify a finding of the torture-murder special circumstance. Section 190.2, subdivision (a)(18), provides for this special circumstance where "[t]he murder was intentional *and involved the infliction of torture*." (Italics added.) Unlike section 189, which defines the crime of

first degree torture murder as murder "perpetrated by means of . . . torture," thereby positing the requirement of a causal relationship between the torturous act and death (*People* v. *Proctor, supra,* 4 Cal.4th 499, 530; *People* v. *Pensinger, supra,* 52 Cal.3d 1210, 1239; see *People* v. *Davenport, supra,* 41 Cal.3d 247, 267), section 190.2, subdivision (a)(18), does not by its terms require such a causal relationship. (*People* v. *Hoban* (1985) 176 Cal.App.3d 255, 264 [221 Cal.Rptr. 626]; cf. *People* v. *Pensinger, supra,* 52 Cal.3d 1210, 1239 [§ 189 requires causation, because that statute defines torture murder as murder "by means of" torture].) Because other types of murder, such as premeditated murder, also are defined as murder of the first degree, we believe the Legislature, by employing the broader language of section 190.2, subdivision (a)(18), intended to encompass (within the torture-murder special circumstance) acts of torture occurring within a larger time frame, including those that would not have caused death. (*Ibid.*)[15] We conclude the prosecution was not required to prove that the acts of torture inflicted upon William were the cause of his death. Therefore, we also reject defendant's related contention that the special circumstance instruction on torture improperly failed to require that there be a causal relationship between the torture and the victim's death.

### D. *Instruction as to reasonable doubt*

#### 1. *CALJIC No. 2.90*

■ Defendant contends that the definition of reasonable doubt contained in CALJIC No. 2.90 (§§ 1096, 1096a), inasmuch as it contains references to "moral evidence" and "moral certainty," impermissibly dilutes the prosecution's constitutionally imposed burden of proof beyond a reasonable doubt.[16] In *Victor* v. *Nebraska* (1994) 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239], affirming *People* v. *Sandoval* (1992) 4 Cal.4th 155, 185-186 [14 Cal.Rptr.2d 342, 841 P.2d 862], the United States Supreme Court concluded that the California reasonable doubt instruction is constitutional.

---

[15]Section 190.2, subdivision (a)(18), does require that the defendant act with intent to kill. (*People* v. *Proctor, supra,* 4 Cal.4th 499, 535; *People* v. *Davenport, supra,* 41 Cal.3d 247, 271.) That requirement does not, however, establish that the torture must cause the death.

[16]The instruction provides that a reasonable doubt is "not a mere possible doubt, because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge."

Defendant requested that, in light of the then pending review before the United States Supreme Court (cert. granted *sub nom. Sandoval* v. *California* (1993) __ U.S. __ [125 L.Ed.2d 789, 114 S.Ct. 40]) of the constitutionality of California's reasonable doubt instruction (CALJIC No. 2.90), he be permitted to file supplemental briefing on that issue. We granted defendant's request.

(See *People* v. *Freeman* (1994) 8 Cal.4th 450, 501-505 [34 Cal.Rptr.2d 558, 882 P.2d 249].)

The court in *Victor* initially reviewed the use of the term "moral evidence," noting that, in defining the phrase "reasonable doubt," the jury was told that "everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt." The high court explained: "[I]n other words, . . . absolute certainty is unattainable in matters relating to human affairs. Moral evidence, in this sentence, can only mean empirical evidence offered to prove such matters — the proof introduced at trial." (*Victor* v. *Nebraska, supra,* 511 U.S. __, __ [127 L.Ed.2d 583, 595].) The high court observed that this conclusion was reinforced by other instructions requiring that the jurors determine the facts only from the evidence received at trial, defining the nature of that evidence, and requiring the jurors not to allow themselves to be swayed by pity or prejudice — instructions that correctly directed the jurors' attention to the facts of the case before them, and not to the ethics or morality of Sandoval's criminal acts. (*Ibid.*)

The high court also reviewed the phrase "moral certainty," concluding that, although in one respect that phrase is ambiguous in the abstract, the other instructions provided in the case lent content to the phrase, inasmuch as the jurors were told they must have " 'an abiding conviction, to a moral certainty, of the truth of the charge,' " and "an instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof. [Citation.]" (511 U.S. __, __ [127 L.Ed.2d 583, 596].) The court observed: "[T]he judge had already informed the jury that matters relating to human affairs are proven by moral evidence [citation]; giving the same meaning to the word moral in this part of the instruction, moral certainty can only mean certainty with respect to human affairs. As used in this instruction, therefore, we are satisfied that the reference to moral certainty, in conjunction with the abiding conviction language, 'impress[ed] upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused.' [Citation.]" (511 U.S. __, __ [127 L.Ed.2d 583, 596].) The court further explained that, in view of the additional instructions concerning the jurors' duty to determine the facts from the evidence at trial and their duty not to be swayed by pity or prejudice, it was not "reasonably likely the jury understood the words moral certainty either as suggesting a standard of proof lower than due process requires or as allowing conviction on factors other than the government's proof." (*Id.* at p. __ [127 L.Ed.2d at p. 597].)

In the present case, the jury received instruction on reasonable doubt in a form identical to that provided in *Sandoval.* Moreover, the jurors also

received the standard instructions requiring that they determine the facts solely from the evidence presented at trial and that they not allow themselves to be swayed by pity or prejudice. (CALJIC Nos. 1.00, 1.03) Accordingly, we conclude there was no error.

### 2. *CALJIC instructions on circumstantial evidence*

■ Defendant also contends that four other instructions provided in the present case undermined the constitutional requirement of proof beyond a reasonable doubt. In these instructions, which pertained to the sufficiency of circumstantial evidence to prove (1) the charged offenses (CALJIC No. 2.01), (2) the required mental state (CALJIC No. 2.02), (3) the special circumstance allegations (CALJIC No. 8.83), and (4) the required mental state as to the special circumstance allegations (CALJIC No. 8.83.1), the trial court informed the jury that, if one interpretation of the evidence "appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

Specifically, defendant urges that, by informing the jurors of their duty to accept an interpretation of the evidence establishing defendant's guilt as long as that interpretation appears to be reasonable, the instructions (emphasized by the prosecutor's argument to the jury that the prosecution had presented a reasonable interpretation of the evidence) permitted the jury to determine guilt based upon a degree of proof less than that mandated by the reasonable doubt standard (see *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068, 1072]; see also *Cage* v. *Louisiana* (1990) 498 U.S. 39 [112 L.Ed.2d 339, 111 S.Ct. 328].) Defendant urges that the instructions thus functioned to convey an unconstitutional, mandatory, conclusive presumption of guilt. (See *Carella* v. *California* (1989) 491 U.S. 263, 265-266 [105 L.Ed.2d 218, 221-222, 109 S.Ct. 2419]; *Sandstrom* v. *Montana* (1979) 442 U.S. 510, 515 [61 L.Ed.2d 39, 45-46, 99 S.Ct. 2450].)

We repeatedly have rejected analogous contentions. (*People* v. *Noguera* (1993) 4 Cal.4th 599, 633-634 [15 Cal.Rptr.2d 400, 842 P.2d 1160], *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1234-1235 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People* v. *Wilson, supra,* 3 Cal.4th 926, 942-943; *People* v. *Jennings* (1991) 53 Cal.3d 334, 385-386 [279 Cal.Rptr. 780, 807 P.2d 1009].) When the questioned phrase is read in context, not only with the remaining language within each instruction but also together with related instructions, including the reasonable doubt instruction, it is clear that the jury was required only to reject unreasonable interpretations of the evidence and to accept a reasonable interpretation that was consistent with the evidence. (*People* v. *Jennings, supra,* 53 Cal.3d 334, 386.)

III. PENALTY PHASE ISSUES

A. *Alleged guilt phase error requiring reversal of penalty determination*

Defendant contends that any error occurring at the guilt phase, if state law error, would require reversal of the penalty determination if there is a reasonable possibility that the jury would have rendered a different verdict absent the error. (*People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135].) Defendant also contends that if any error occurred of a federal constitutional nature, then an even stricter standard of reversal should apply. (See *Yates* v. *Evatt* (1992) 500 U.S. 391, 402-405 [114 L.Ed.2d 432, 448-449, 111 S.Ct. 1884]; *Chapman.* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) Defendant asserts that improper admission into evidence of his statements to the police and of the photographs of the murder victims, and erroneous submission of the torture special-circumstance allegation to the jury, constituted prejudicial error at the penalty phase of defendant's trial. As indicated above, we have concluded that no error occurred with regard to these aspects of the guilt phase of the trial. Accordingly, these claims afford no basis for reversal of the penalty determination.

B. *Alleged prosecutorial misconduct*

Defendant raises a number of contentions related to the prosecutor's comments concerning defendant's lack of remorse. During the presentation of defense evidence in mitigation at the penalty phase, defendant's sister testified she had written letters to defendant. While cross-examining her, the prosecutor inquired: "In any of those letters, Mrs. Williams, did Mr. Crittenden ever express to you any remorse for killing the Chiapellas?" Defense counsel objected on the basis of relevancy. The objection was overruled. Defendant's sister responded, " No. He didn't. He never answered, said anything like that. He always told me he did not commit this, and I believe my brother."

The prosecutor then commenced his closing argument. After commenting that the defense witnesses had been presented for the sole purpose of arousing sympathy for defendant, the prosecutor commented that, before "investing one scintilla of sympathy" in defendant's cause, the jury should consider whether defendant had ever, "once, expressed a single feeling of remorse about the annihilation of this elderly couple." After defining the concept of remorse, commenting that its value is recognized universally, and repeating several times that no witnesses testified that defendant had expressed any remorse, the prosecutor concluded on this point: "And it would

seem to me that before you consider allowing Mr. Crittenden to live under a sentence of life without the possibility of parole, you'd ask to see at least some evidence of remorse from Mr. Crittenden for the perpetration of these crimes."

Generally, we have concluded that, because a timely objection and admonition would cure any harm flowing from a prosecutor's improper remarks or argument to the jury, a claim the prosecutor improperly referred to a defendant's lack of remorse is waived if an objection is not made during the trial on the specific ground raised on appeal. (Evid. Code, § 353; see, e.g., *People v. Roberts* (1992) 2 Cal.4th 271, 335-336 [6 Cal.Rptr.2d 276, 826 P.2d 274]; *People v. Hardy, supra,* 2 Cal.4th 86, 208; *People v. Wharton, supra,* 53 Cal.3d 522, 593; *People v. Bell* (1989) 49 Cal.3d 502, 548 [262 Cal.Rptr. 1, 778 P.2d 129], *People v. Allison* (1989) 48 Cal.3d 879, 902-903 [258 Cal.Rptr. 208, 771 P.2d 1294]; see also *People v. Cummings* (1993) 4 Cal.4th 1233, 1329 [18 Cal.Rptr.2d 796, 850 P.2d 1].) Therefore, defendant's claims described below (other than the claim that the prosecutor invited the jury to consider prejudicial evidence not relevant to the penalty determination) have been waived.

Nonetheless, in view of the potential claim that counsel's failure to object on the specific grounds urged on appeal denied him his rights under the state and federal Constitutions to the effective assistance of counsel, we review these claims on the merits. (See *People v. Hardy, supra,* 2 Cal.4th 86, 208-209.)

1. *Doyle claim*

Defendant contends that the prosecutor committed error under *Doyle v. Ohio* (1976) 426 U.S. 610, 618 [49 L.Ed.2d 91, 98, 96 S.Ct. 2240] [holding the prosecution is not permitted to impeach a defendant's exculpatory statements by referring to his having remained silent after receiving *Miranda* warnings], in emphasizing in cross-examination and closing argument the circumstance that defendant had not expressed remorse, thereby drawing attention to his failure to confess upon interrogation and, accordingly, violating his privilege against self-incrimination.

We repeatedly have commented that the presence or absence of remorse is a factor "universally" deemed relevant to the jury's penalty determination. (See, e.g., *People v. Hardy, supra,* 2 Cal.4th 86, 209-210; *People v. Gallego* (1990) 52 Cal.3d 115, 197 [276 Cal.Rptr. 679, 802 P.2d 169]; see also *People v. Breaux* (1991) 1 Cal.4th 281, 313 [3 Cal.Rptr.2d 81, 821 P.2d 585].) We have rejected the contention that such comment violated the *Doyle*

rule when that contention was raised with reference to the 1977 death penalty law (see *People* v. *Hovey* (1988) 44 Cal.3d 543, 580 [244 Cal.Rptr. 121, 749 P.2d 776]), and our conclusion is the same under the present law. In the case before us, the prosecutor's generalized references to defendant's lack of remorse contained no allusion to the circumstance that defendant had not confessed after receiving *Miranda* warnings prior to questioning.

### 2. *Griffin claim*

■ Defendant contends the prosecutor's references during cross-examination and closing argument to defendant's lack of remorse violated the principles established by *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], a decision that prohibits prosecutors from commenting upon a defendant's failure to testify.

Although, as indicated above, the prosecution may comment upon a defendant's lack of remorse, in doing so it may not refer to the defendant's failure to testify. (See *People* v. *Cummings, supra,* 4 Cal.4th 1233, 1329; *People* v. *Hardy, supra,* 2 Cal.4th 86, 209; *People* v. *Breaux, supra,* 1 Cal.4th 281, 313; *People* v. *Beardslee* (1991) 53 Cal.3d 68, 113-114 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People* v. *Bell, supra,* 49 Cal.3d 502, 548; *People* v. *Morales* (1989) 48 Cal.3d 527, 570-571 [257 Cal.Rptr. 64, 770 P.2d 244]; *People* v. *Keenan* (1988) 46 Cal.3d 478, 509 [250 Cal.Rptr. 550, 758 P.2d 1081].) Similarly, we have recognized that a prosecutor may not urge that a defendant's failure to take the stand at the penalty phase, in order to confess his guilt after having been found guilty, demonstrates a lack of remorse. (*People* v. *Pensinger, supra,* 52 Cal.3d 1210, 1270-1271; see *People* v. *Keenan, supra,* 46 Cal.3d 478, 509; *People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168-1169 [80 Cal.Rptr. 920, 459 P.2d 248].)

In the present case, the prosecutor's brief cross-examination and subsequent comments during closing argument concerning lack of remorse cannot fairly be interpreted to refer to defendant's failure to testify. The reference during cross-examination occurred as part of the prosecutor's inquiry to defendant's sister whether, in writing letters to her, defendant ever had expressed remorse. The prosecutor's comment during closing argument simply referred to defendant's callous behavior after the killings and occurred during the prosecutor's review of the circumstances and nature of these crimes and of defendant's activities after their commission. (See *People* v. *Breaux, supra,* 1 Cal.4th 281, 313.) The prosecutor's reference to defendant's lack of remorse was not a comment upon his failure to testify during the trial or to take the stand and confess his guilt following the guilt phase, but was a legitimate reference to the circumstance that, in communications with numerous individuals, defendant never expressed regret concerning the murders. (*People* v. *Cummings, supra,* 4 Cal.4th 1233, 1329; *People* v. *Keenan, supra,* 46 Cal.3d 478, 509.)

### 3. Reliability of penalty determination

■ Defendant contends the prosecutor's comments upon defendant's lack of remorse invited the jury to consider prejudicial evidence not *relevant* to the penalty determination and thus violated his right under the Eighth Amendment to a reliable determination of penalty. (*Johnson* v. *Mississippi* (1988) 486 U.S. 578 [100 L.Ed.2d 575, 108 S.Ct. 1981] [sentencing determination may not be predicated upon totally irrelevant factors]; *Zant* v. *Stephens* (1983) 462 U.S. 862, 884-885, 887, fn. 24 [77 L.Ed.2d 235, 254-255, 256, 103 S.Ct. 2733].) As indicated in the preceding discussion, we repeatedly have concluded that lack of remorse is a relevant consideration, because the presence of remorse is regarded as a mitigating factor. Accordingly, the prosecutor's suggestion to the jury that it consider defendant's lack of remorse did not render the penalty determination unreliable.

### 4. Boyd claim

■ Defendant contends the prosecutor's references during cross-examination and argument to defendant's lack of remorse constituted prohibited references to a nonstatutory factor in aggravation. In *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782], we held that a prosecutor may not present evidence in aggravation that is not relevant to the statutory factors enumerated in section 190.3. (38 Cal.3d at pp. 772-776.) Although lack of remorse is not a statutory aggravating factor, the absence of remorse is relevant to the determination whether the mitigating factor of remorse is present; thus, the prosecutor properly may suggest that an absence of evidence of remorse weighs against a finding of remorse as a *mitigating* factor. (*People* v. *Sims, supra,* 5 Cal.4th 405, 464-465; *People* v. *Wharton, supra,* 53 Cal.3d 522, 593; *People* v. *Gallego, supra,* 52 Cal.3d 115, 197; *People* v. *Keenan, supra,* 46 Cal.3d 478, 510.)

In the present case, the prosecutor presented no additional evidence at the penalty phase of the trial. Contrary to defendant's assertion, the question eliciting, and subsequent argument emphasizing, the absence of any expression of remorse on defendant's part after the commission of the offenses did not suggest the presence of a nonstatutory factor in aggravation, but simply underscored the lack of evidence of remorse as a factor in mitigation. (see *People* v. *Gallego, supra,* 52 Cal.3d 115, 197.)

### 5. Davenport claim

Finally, defendant claims the prosecutor's argument emphasizing defendant's lack of remorse violated the rule in *People* v. *Davenport, supra,* 41

Cal.3d 247, 288-290, that the prosecutor may not argue that the absence of a mitigating factor constitutes the presence of an aggravating factor. Neither the prosecutor's question nor his subsequent argument referred to the absence of remorse as a factor in aggravation; they merely emphasized defendant's lack of remorse—an emphasis whose propriety we repeatedly have endorsed. (See, e.g., *People* v. *Sims, supra,* 5 Cal.4th 405, 464-465; *People* v. *Hardy, supra,* 2 Cal.4th 86, 210; *People* v. *Ashmus* (1991) 54 Cal.3d 932, 992-993 [2 Cal.Rptr.2d 112, 820 P.2d 214]; *People* v. *Keenan, supra,* 46 Cal.3d 478, 510; cf. *People* v. *Allison, supra,* 48 Cal.3d 879, 902-903.)

## C. *Denial of motion to modify judgment*

### 1. *Defendant's lack of remorse*

During consideration of the automatic motion to modify the judgment pursuant to section 190.4, subdivision (e), the trial court reviewed the evidence pertinent to section 190.3, factor (a) (the circumstances of the offenses). The court noted the advanced age of the victims, that William was partially handicapped, that the victims were rendered defenseless, the brutality of the victims' chest wounds, the multiple wounds (some clearly nonfatal) inflicted upon the victims' heads and faces, the nature of the nonfatal wounds inflicted on William's jaw and mouth, the needless infliction of pain upon Katherine through wounds to the lip and stomach, the indignity caused by the removal of Katherine's underclothing if that occurred prior to her death (or the depravity of that act if occurring after her death), the planning engaged in by defendant in transporting to the scene and using a slaughtering knife to inflict injury, the stabbing torture of William, the sophistication of the offenses (evidenced by defendant's having brought from his own home a pillowcase used to bind the victims, as well as his care in not leaving evidence of his presence), the circumstance that defendant was motivated by financial gain, the callousness of the offenses, defendant's repeated attempts at escape, and the kidnapping of Kronen.

In the course of this recitation of factors, the trial court stated: "Eleven. Lack of remorse. The defendant wrote on both bathrooms the epitaph for William and Katherine Chiapella that the horror visited on the Chiapella household was 'just the beginning.' This statement was not used to show any future dangerous tendencies nor is it considered as such here. Also, although lack of remorse is not an aggravating factor in the scheme of aggravating and mitigating factors, it is a circumstance of the crime which may be properly considered bearing on the issue of the circumstances surrounding the commission of the crime. [¶] Additionally, the defendant conducted himself as his happy, normal self within minutes of the killings. He went with his

girlfriend for a walk, then to dinner, talked happily about the future, and went to the movies. His conduct was such that a total lack of conscience on the defendant's part is demonstrated. That he held the victims in contempt is exhibited by the use of Mrs. Chiapella as an object of lurid and obscene fabrications."

Defendant contends the trial court's use of defendant's post-offense conduct, defendant's "total lack of conscience," and defendant's "lurid and obscene fabrications" involving Katherine was impermissible under the rule expressed in *People* v. *Boyd, supra,* 38 Cal.3d 762, 772-776, that evidence in aggravation bearing upon a nonstatutory matter may not be considered, and also was impermissible under the holding set forth in *People* v. *Davenport, supra,* 41 Cal.3d 247, 288-290, that the absence of a mitigating factor may not be considered a factor in aggravation.

Pursuant to section 190.4, in ruling upon an application for modification of a verdict imposing the death penalty, the trial court must reweigh independently the evidence of aggravating and mitigating circumstances and then determine whether, in its independent judgment, the weight of the evidence supports the jury's verdict. (§ 190.4, subd. (e); *People* v. *Diaz* (1993) 3 Cal.4th 495, 571 [11 Cal.Rptr.2d 353, 834 P.2d 1171]; *People* v. *Edwards* (1991) 54 Cal.3d 787, 846 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People* v. *Lang* (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627].) The trial court must "consider, take into account, and be guided by" the aggravating and mitigating circumstances referred to in section 190.3.

As indicated in the discussion above, lack of remorse, because it suggests the absence of a mitigating factor, is deemed a relevant factor in the jury's determination as to whether the factors in aggravation outweigh those in mitigation, and is thus an appropriate subject of comment by the prosecutor, so long as he or she does not argue that lack of remorse constitutes a factor in aggravation. Because a trial court, in ruling upon a motion for modification of a death verdict, is charged with reviewing that determination in light of the same aggravating and mitigating factors that guided the jury, no error was committed by the trial court in giving proper consideration to defendant's lack of remorse. (See *People* v. *Marshall* (1990) 50 Cal.3d 907, 943-944 [269 Cal.Rptr. 269, 790 P.2d 676].)[17]

In the present case, it is clear from the trial court's comments that it understood lack of remorse could not be considered as a factor in aggravation. Contrary to defendant's argument, the circumstance that the court, in

---

[17]Remorseless conduct or comment at the scene of the offense (e.g., the threatening message written by defendant on the mirrors) may be considered in aggravation pursuant to section 190.3, factor (a) (*People* v. *Webster, supra,* 54 Cal.3d 411, 452; *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1231-1232 [275 Cal.Rptr. 729, 800 P.2d 1159]), although we have held that post-offense lack of remorse may not be considered. (*Id.* at p. 1232.)

evaluating the circumstances of the offenses, discussed the post-offense behavior of defendant that was indicative of a lack of remorse, does not suggest the trial court actually employed defendant's lack of remorse as a circumstance in aggravation. The behavior noted by the court occurred either immediately following the offenses or within a few days of their commission, and the court's consideration of that behavior logically followed its consideration of the nature of the offenses. The trial court did not err, in the course of its review of the circumstances of the offenses, in reflecting briefly upon evidence relevant to the absence of a mitigating factor.

### 2. Consideration of defendant's probation report

■ Defendant contends the trial court improperly considered the probation report in ruling upon the application for modification of the verdict of death. We previously have held that, in ruling upon an automatic motion for modification of the penalty, the trial court may consider only the evidence before the jury, and that therefore it is error to consider the probation report, a matter not before the jury. (*People* v. *Clark, supra,* 5 Cal.4th 950, 1038; *People* v. *Wader* (1993) 5 Cal.4th 610, 665 [20 Cal.Rptr.2d 788, 854 P.2d 80]; *People* v. *Fauber* (1992) 2 Cal.4th 792, 866 [9 Cal.Rptr.2d 24, 831 P.2d 249].) Nonetheless, in the event the trial court has considered the report, we assume the court was not improperly influenced thereby, absent evidence in the record to the contrary. (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1106 [25 Cal.Rptr.2d 867, 864 P.2d 40]; *People* v. *Clark, supra,* 5 Cal.4th 950, 1038-1039; *People* v. *Fauber, supra,* 2 Cal.4th 792, 866; see *People* v. *Brown* (1993) 6 Cal.4th 322, 337 [24 Cal.Rptr.2d 710, 862 P.2d 710]; cf. *People* v. *Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892].)

The record in the present case reveals that the trial court reviewed the factors in aggravation and mitigation and then denied the automatic motion for modification. The court thereafter proceeded to sentence defendant. Immediately prior to sentencing, the court noted that it had considered the probation reports for both the murder and the kidnapping offenses.

Because there was no recess between the proceedings at which the trial court considered the motion to modify and the proceedings at which it imposed sentence, it appears that at the time it reviewed and ruled upon the application for modification of the penalty the court already had read and considered the probation report. That circumstance did not result in any prejudice to defendant, however. The court did not allude to the probation report during its review and determination of the motion to modify the death verdict. The court reviewed each of the potentially aggravating and mitigating factors, and in determining the nature of, and weight attributable to, each

factor, articulated detailed reasons based upon the evidence presented during the trial. Our review discloses that the court made its determination in reliance upon the evidence submitted at trial, placing great weight upon the circumstances of the crime. (*People* v. *Clark, supra,* 5 Cal.4th 950, 1038.) There is no reasonable possibility that the court's apparent error in considering the probation report affected its decision. (*People* v. *Wader, supra,* 5 Cal.4th 610, 666-667; *People* v. *Fauber, supra,* 2 Cal.4th 792, 866-867; *People* v. *Gonzalez, supra,* 51 Cal.3d 1179, 1238.) Nor do we detect any federal constitutional error that would justify remand to the trial court for reconsideration of the motion.

### D. *Constitutionality of Penal Code section 190.3*

#### 1. *Prosecutorial discretion*

 Defendant contends that the death penalty law is unconstitutionally arbitrary and capricious and violates the principle of separation of powers, in that it delegates to each district attorney, through his or her decision whether to seek the death penalty, the power effectively to decide which defendants will be sentenced to death. We disagree.

As we previously have explained, prosecutorial discretion to select those eligible cases in which the death penalty actually will be sought does not, in and of itself, evidence an arbitrary and capricious capital punishment system, nor does such discretion transgress the principles underlying due process of law, equal protection of the laws, or the prohibition against cruel and unusual punishment. (*People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1024 [30 Cal.Rptr.2d 818, 874 P.2d 248]; *People* v. *Keenan, supra,* 46 Cal.3d 478, 505; accord, *People* v. *Ashmus, supra,* 54 Cal.3d 932, 980.) Similarly, we conclude that the death penalty law does not violate the constitutional principle of separation of powers (Cal. Const., art. III, § 3) by delegating sentencing authority to the prosecution through that entity's power to decide whether to seek the death penalty, because ultimate sentencing power at all times remains in the judicial branch. (*People* v. *Kirkpatrick, supra,* 7 Cal.4th 988, 1024.)

#### 2. *Alleged lack of procedural safeguards, and other defects*

Defendant contends the 1978 statute providing for the death penalty lacks procedural safeguards and contains numerous substantive defects. We previously have rejected the majority of such claims and decline defendant's invitation to reconsider our rulings; however, we specify below the nature of the claims in denying them. We previously have concluded that there is no

requirement that the statute (§ 190.3) define which factors are aggravating and which are mitigating, and the factors need not be labeled exclusively as aggravating or mitigating. (*People* v. *Montiel* (1993) 5 Cal.4th 877, 943 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1191 [9 Cal.Rptr.2d 834, 832 P.2d 146].) There is no requirement that the court instruct the jury that, before it may fix the penalty at death, it must find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances, and that death is beyond a reasonable doubt the appropriate penalty. (*People* v. *Diaz, supra,* 3 Cal.4th 495, 569-570; *People* v. *Clark, supra,* 3 Cal.4th 41, 170; *People* v. *Livaditis* (1992) 2 Cal.4th 759, 786 [9 Cal.Rptr.2d 72, 831 P.2d 297]; see *People* v. *McPeters, supra,* 2 Cal.4th 1148, 1195.) The trial court is not required to instruct the jury that it must find any aggravating factor true beyond a reasonable doubt (*People* v. *Livaditis, supra,* 2 Cal.4th 759, 785; *People* v. *Mickey, supra,* 54 Cal.3d 612, 701-702; *People* v. *Benson, supra,* 52 Cal.3d 754, 807-808), nor is there is any requirement that the jury unanimously find true the circumstance or circumstances in aggravation that support its verdict. (*People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 147 [2 Cal.Rptr.2d 335, 820 P.2d 559], cert. granted and vacated *Bacigalupo* v. *California* (1992) 503 U.S. __ [121 L.Ed.2d 5, 113 S.Ct. 32], subsequent opn. on remand *People* v. *Bacigalupo* (1993) 6 Cal.4th 457 [24 Cal.Rptr.2d 808, 862 P.2d 808]; *People* v. *Cox, supra,* 53 Cal.3d 618, 692; *People* v. *Andrews, supra,* 49 Cal.3d 200, 233.) The court need not require that the jury submit written findings as to which aggravating circumstances it relied upon in imposing the death penalty. (*People* v. *Livaditis, supra,* 2 Cal.4th 759, 786; *People* v. *Kelly* (1990) 51 Cal.3d 931, 970 [275 Cal.Rptr. 160, 800 P.2d 516]; *People* v. *Medina* (1990) 51 Cal.3d 870, 909-910 [274 Cal.Rptr. 849, 799 P.2d 1282].) No constitutional infirmity arises from permitting the prosecutor to peremptorily challenge prospective jurors who indicate opposition to, or concern over, the death penalty, because both sides may employ challenges on the basis of juror attitudes toward capital punishment. (See *People* v. *Pride, supra,* 3 Cal.4th 195, 227-228; *People* v. *Livaditis, supra,* 2 Cal.4th 759, 771-772; *People* v. *Edwards, supra,* 54 Cal.3d 787, 831.)

Defendant also claims, without argument or citation of authority, that the death penalty law is unconstitutional because it does not contain a presumption that life without possibility of parole is the appropriate sentence. Generally, we do not consider contentions unsupported by argument or authority. (*People* v. *Clair, supra,* 2 Cal.4th 629, 653, fn. 2; *People* v. *Roberts, supra,* 2 Cal.4th 271, 340-341.) Apart from this infirmity, we reject the substance of defendant's claim. (*People* v. *Johnson, supra,* 3 Cal.4th 1183, 1256; *People* v. *Visciotti, supra,* 2 Cal.4th 1, 79.)

Lastly, the combination of the foregoing deficiencies asserted by defendant does not establish collectively a basis for rejecting the death penalty law. (See *People* v. *Clair, supra,* 2 Cal.4th 629, 691, fn. 17.)

### 3. *Failure to narrow the class of death-eligible defendants*

■ Defendant urges that the Eighth Amendment's proscription against cruel and unusual punishment, which requires a meaningful basis for distinguishing the cases in which the death penalty properly is imposed from those in which it is not (*Godfrey* v. *Georgia* (1980) 446 U.S. 420, 433 [64 L.Ed.2d 398, 409-410, 100 S.Ct. 1759] (plur. opn.)), is not satisfied by a death penalty law that fails to narrow the class of defendants found guilty of first degree murder who are eligible for the death penalty.

In particular, defendant contends that the categories of murder subjecting a defendant to eligibility for the death penalty have been expanded to the extent that the death penalty law does not perform the mandated narrowing function. This development, defendant asserts, is reflective of an original unconstitutional purpose, harbored by the proponents of the law, to apply the death penalty in every case of murder. In support of this claim, defendant asserts that the most common types of murders are, or are likely to be, covered by the special circumstance provisions. Defendant also relies upon this court's decision upholding the constitutionality of the lying-in-wait special circumstance (*People* v. *Morales, supra,* 48 Cal.3d 527, 557), as well as the passage by the voters in 1990 of Proposition 114 [adding certain law enforcement personnel to § 190.2, subd. (a)(7) (murder of a peace officer engaged in official duties]) and Proposition 115 (adding § 190.2, subd. (a)(17)(xi) [rape with a foreign instrument]).

■ As we recently explained in *People* v. *Bacigalupo, supra,* 6 Cal.4th 457, 465, the United States Supreme Court has drawn a distinction between the "narrowing" and "selection" aspects of capital sentencing, describing "narrowing" as pertaining to a state's " 'legislative definition' of the circumstances placing a defendant within the class of persons eligible for the death penalty. (*Zant* v. *Stephens*[, *supra,*] 462 U.S. 862, 878 [77 L.Ed.2d 235, 250-251]; *Godfrey* v. *Georgia, supra,* 446 U.S. 420, 428 [64 L.Ed.2d 398, 406].) To comport with the requirements of the Eighth Amendment, the legislative definition of a state's capital punishment scheme that serves the requisite 'narrowing' function must 'circumscribe the class of persons eligible for the death penalty.' (*Zant* v. *Stephens, supra,* 462 U.S. 862, 878 [77 L.Ed.2d at pp. 250-251].) Additionally, it must afford some objective basis for distinguishing a case in which the death penalty has been imposed from the many cases in which it has not. (*Godfrey* v. *Georgia, supra,* 446 U.S. 420, 433 [64 L.Ed.2d at pp. 409-410].) A legislative definition lacking 'some narrowing principle' to limit the class of persons eligible for the death penalty and having no objective basis for appellate review is deemed to be impermissibly vague under the Eighth Amendment. (*Maynard* v. *Cartwright*

[(1988) 486 U.S. 356,] 361 [100 L.Ed.2d 372, 108 S.Ct. 1853]; *Godfrey* v. *Georgia, supra,* 446 U.S. at p. 428 [64 L.Ed.2d at p. 406].)" (*People* v. *Bacigalupo, supra,* 6 Cal.4th 457, 465.)

As we further explained in *Bacigalupo,* under the 1978 death penalty statute the role of special circumstances in requiring that a death verdict be premised upon a jury finding, beyond a reasonable doubt, of the truth of at least one special circumstance, " 'thereby limit[ing] the death sentence to a small subclass' of murders," is essentially identical to their role under California's 1977 death penalty law, which the United States Supreme Court upheld in *Pulley* v. *Harris* (1984) 465 U.S. 37, 51, and footnote 13 [79 L.Ed.2d 29, 40-41, 184 S.Ct. 871] (also noting that California's 1978 death penalty law greatly expanded the number of special circumstances). (*People* v. *Bacigalupo, supra,* 6 Cal.4th 457, 467.) "In California, the special circumstances serve to ' "guide" ' and ' "channel" ' jury discretion, 'by strictly confining the class of offenders eligible for the death penalty.' [Citation.] " (*Ibid.; People* v. *Kirkpatrick, supra,* 7 Cal.4th 988, 1015.)

In support of his theory that the special circumstances nonetheless *inadequately* narrow the class of death eligibles, defendant asserts that "[p]robably the most common types of murders occurring in California are those arising from drug deals, robberies and/or burglaries and domestic disputes," all of which fall, or are likely to fall, within one category or another of the enumerated special circumstances. In *People* v. *Wader, supra,* 5 Cal.4th 610, the defendant made virtually the same contention, which we rejected, observing: "[Defendant] states that all of these types of murders are likely to qualify as capital crimes under a special circumstance. But defendant has not demonstrated on this record, or through sources of which we might take judicial notice, that his claims are empirically accurate, *or that, if they were correct, this would require the invalidation of the death penalty law.*" (*Id.* at p. 669, italics added; see *People* v. *Brown, supra,* 6 Cal.4th 322, 339, fn. 16.) We find defendant's contention in the present case unpersuasive for the same reasons.

We also specifically have rejected the contention that the assertedly broad application of the lying-in-wait special circumstance negates the function of the death penalty law designed to narrow the class of death-eligible defendants. (See *People* v. *Wader, supra,* 5 Cal.4th 610, 669; *People* v. *Roberts, supra,* 2 Cal.4th 271, 322-323.) Moreover, the statutory addition of several subcategories of victims, the murder of whom now may provide the basis for the allegation and finding of a special circumstance, occurred subsequent to the commission of the present offenses and therefore has no bearing upon the constitutionality of the death penalty statute applicable to defendant.

Even taking into account this statutory expansion, however, we believe the death-eligibility component of California's capital punishment law does not exceed constitutional bounds. Accordingly, we reject defendant's contention.

4. *Alleged failure to channel the jury's discretion in penalty determination*

In his supplemental brief, defendant also contends the penalty phase instructions failed to channel the jury's sentencing discretion as required by the Eighth and Fourteenth Amendments. (*Stringer* v. *Black* (1992) 503 U.S. 222 [117 L.Ed.2d 367, 112 S.Ct. 1130].) Specifically, he complains that of the section 190.3 factors in aggravation, factor (a), the circumstances of the crime, and factor (i), the defendant's age, are unconstitutionally vague. In *Tuilaepa* v. *California, supra,* 512 U.S. __, __ [129 L.Ed.2d 750, 762-763, 114 S.Ct. 2630], the United States Supreme Court affirmed the validity of the factors comprising the circumstances of the crime and the defendant's age. (See *People* v. *Noguera, supra,* 4 Cal.4th 599, 648-649; *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 594-595 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; *People* v. *Proctor, supra,* 4 Cal.4th 499, 550-551; see also *People* v. *Berryman, supra,* 6 Cal.4th 1048, 1096-1097; *People* v. *Bacigalupo, supra,* 6 Cal.4th 457, 478-479.) Defendant also contends it was error for the trial court, in ruling upon the automatic motion for modification of the death verdict, to rely upon the assertedly vague factor (a). Because this factor is not unconstitutionally vague, we reject defendant's claim.

5. *Alleged arbitrary, discriminatory, and disproportionate application of penalty*

██ Defendant contends that imposition of the death penalty is arbitrary, discriminatory, and disproportionate under the due process and equal protection clauses and violates the prohibitions against cruel and unusual punishment set forth in the California and federal Constitutions. He requested that the trial court, and now requests that this court, undertake a comparative sentence review.

We have observed on prior occasions that intercase proportionality review is not required by the federal Constitution. (*Pulley* v. *Harris, supra,* 465 U.S. 37, 50-51 [79 L.Ed.2d 29, 40-51]; *People* v. *Mincey, supra,* 2 Cal.4th 408, 476; *People* v. *Hayes, supra,* 52 Cal.3d 577, 645.) Moreover, this court consistently has held that such review is not mandated under our state Constitution in order to ensure due process and equal protection, nor is it required in order to avoid the infliction of cruel or unusual punishment. (*People* v. *Mincey, supra,* 2 Cal.4th 408, 476; *People* v. *Lewis, supra,* 50

Cal.3d 262, 285; *People* v. *Babbitt, supra,* 45 Cal.3d 660, 725.) In particular, we previously have rejected the argument now made by defendant, premised upon equal protection principles, that "disparate sentence review" under section 1170, subdivision (f), must be performed in capital cases. (*People* v. *Cox, supra,* 53 Cal.3d 618, 691; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1286-1288 [232 Cal.Rptr. 849, 729 P.2d 115].)

In any event, unless a defendant demonstrates that the state's capital punishment law operates in an arbitrary and capricious manner, the circumstance that he or she has been sentenced to death, while others who may be similarly situated have received a lesser sentence, does not establish disproportionality violative of the Eighth Amendment. (*McCleskey* v. *Kemp* (1987) 481 U.S. 279, 306-307 [95 L.Ed.2d 262, 287-288, 107 S.Ct. 1756]; *People* v. *Visciotti, supra,* 2 Cal.4th 1, 77.) Moreover, the opportunities afforded the prosecutor for discretionary action and, in particular, discretionary leniency toward defendants, do not render a particular capital sentencing provision arbitrary or capricious. (*McCleskey* v. *Kemp, supra,* 481 U.S. 279, 307-308 & fn. 28 [95 L.Ed.2d 262, 288-289]; *People* v. *Marshall, supra,* 50 Cal.3d 907, 946-947; *People* v. *Keenan, supra,* 46 Cal.3d 478, 505-506.)

We have considered the material to which defendant has referred, consisting of defense counsel's case summaries for 23 prosecutions involving death-eligible defendants arising in a 6-county area including Butte and Placer Counties, offered at the time of defendant's motion for modification of the death verdict pursuant to section 190.4. Even assuming the accuracy of the summaries (which is not otherwise established), the penalties sought (and imposed) reflect nothing other than the appropriate exercise of prosecutorial discretion in light of the unique factual circumstances of each case. We conclude that the type of showing required to invalidate California's death penalty law has not been made. (See *People* v. *Morris, supra,* 53 Cal.3d 152, 235, fn. 25; *People* v. *Marshall, supra,* 50 Cal.3d 907, 946-947; *People* v. *McLain, supra,* 46 Cal.3d 97, 121.)

Defendant also requests that this court perform an intracase proportionality review, urging that the sentence imposed was disproportionate in light of defendant's age and background and the circumstances of this case. We previously have concluded that the imposition of a death sentence is subject to such review, because a sentence grossly disproportionate to the offenses for which it is imposed may violate the prohibition against cruel or unusual punishment. (Cal. Const., art. I, § 17; *People* v. *Mincey, supra,* 2 Cal.4th 408, 476.)

The evidence presented by the defense in mitigation, emphasizing primarily the love and respect defendant had engendered in his family and peers,

was not insubstantial. At the time of the commission of the present offenses, defendant's age was only 19 years and 4 months, and the prosecution did not present evidence of prior criminality. Although certain evidence suggesting defendant suffered from mild brain damage was offered by the defense, it was neutralized by the testimony of various sympathetic witnesses that he assisted others with schoolwork and was an above-average student, and the circumstance that he was enrolled at a state university at the time of the offenses.

Far outweighing those mitigating circumstances, however, the evidence that related to the commission of the offenses established that defendant, having selected his particularly vulnerable victims and having prepared to overpower and destroy them in advance, gained entrance to the victims' home on the pretext of accepting a job from them, rendered the victims completely helpless, and committed deliberate acts of exceptional cruelty, culminating in their death—acts wholly gratuitous and unnecessary to his plan to rob them. The evidence pertaining to the offenses utterly refutes defendant's contention that his death sentence was arbitrary, discriminatory, and disproportionate. (See *People* v. *Alcala* (1992) 4 Cal.4th 742, 809-810 [15 Cal.Rptr.2d 432, 842 P.2d 1192]; *People* v. *Mincey, supra,* 2 Cal.4th 408, 476-477; *People* v. *Edwards, supra,* 54 Cal.3d 787, 848-849.)

E. *Failure separately to determine penalty for each murder*

 In reliance upon the due process clause and the prohibition against cruel and unusual punishment contained in the Eighth and Fourteenth Amendments, as well as their counterparts in the California Constitution (Cal. Const., art. I, §§ 7, 15, and 17), defendant contends the trial court erred by instructing the jury to render a single verdict, either of life imprisonment without possibility of parole or death, with reference to both victims, rather than instructing the jury to render a separate verdict as to each victim. Defendant also maintains that the court erred in delivering to the jury only two forms, one for each possible penalty, rather than four forms reflecting the two possible penalties as to each victim.

Initially, we observe that, in the event error occurred, it was invited by defense counsel. (See *People* v. *Wader, supra,* 5 Cal.4th 610, 657-658; *People* v. *Cooper* (1991) 53 Cal.3d 771, 831 [281 Cal.Rptr. 90, 809 P.2d 865]; *People* v. *Gallego, supra,* 52 Cal.3d 115, 202). When the court was in the process of preparing the verdict forms, defense counsel requested that the court present only two verdict forms to the jury; defense counsel approved the court's suggestion that each possible penalty be presented on a single form. Subsequently, the trial court handed counsel for both parties copies of

these forms for approval, and later, when the court began to inquire whether both parties had read the forms, defense counsel interjected, " The verdicts. Yes, they are fine." At the time the trial court provided the forms to the jury, the court, without incurring any comment from defense counsel, repeated the observation that there were only two forms for the two possible penalties.

In any event, no error occurred. Although it is proper to employ separate verdict forms when there is more than one murder victim (see, e.g., *People* v. *Sandoval, supra,* 4 Cal.4th 155, 197 [separate death verdict returned as to one murder victim, separate life imprisonment without possibility of parole verdict returned as to each of three other murder victims]; *People* v. *Beardslee, supra,* 53 Cal.3d 68, 117 [separate death verdict returned as to each of two murder victims]; *People* v. *Bittaker, supra,* 48 Cal.3d 1046, 1106, 1110, fn. 34 [separate death verdict as to each of five murder victims]), no authority compels the rendering of separate penalty verdicts as to each victim.

Moreover, as suggested by the defendant's contrary argument in *People* v. *Sandoval, supra,* 4 Cal.4th 155, 197, that separate penalty verdict forms should *not* have been provided, the use of a single verdict form encompassing the penalty for the murder of more than one victim conceivably may promote a comprehensive determination as to whether the death penalty is appropriate in a particular case, without placing undue emphasis upon the characteristics and status of the individual victims or their number.

Nonetheless, defendant asserts that, in the absence of a separate verdict form pertaining to each murder victim, it is possible that, for example, only six jurors concluded defendant should receive the death penalty for William's murder, while the remaining six jurors determined defendant should receive the death penalty for Katherine's murder. As we observed earlier, in applying the provisions of section 190.3 so as to arrive at a death verdict, the jurors each must evaluate the evidence and then unanimously determine that the aggravating factors outweigh the mitigating factors, but there is no requirement that the jury agree upon the factors employed in reaching that decision. (See *People* v. *Sims, supra,* 5 Cal.4th 405, 462.) The murders of William and Katherine, and the circumstances attendant upon those murders, were matters appropriately considered under section 190.3, factor (a) (comprising the circumstances of the crimes). Because there is no requirement that the jury unanimously determine which aggravating factors outweigh those in mitigation, there obviously can be no requirement that the jury unanimously determine which facts *within* a single category of the factors described in section 190.3, such as factor (a), justify imposition of the death penalty.

IV. *Disposition*

The judgment is affirmed in its entirety.[18]

Lucas, C. J., Kennard, J., Arabian, J., Baxter, J., and Werdegar, J., concurred.

**MOSK, J.**—I concur in the judgment and generally in the opinion that Justice George has prepared for the court.

I write separately to make this statement. I have not been persuaded by defendant that the 1978 death penalty law, as it was originally enacted, violated the Eighth Amendment to the United States Constitution, on its face or as applied to him, by failing to properly define the class of persons subject to the ultimate sanction. I do not, however, arrive at a more positive conclusion. Certainly, the law, as it has subsequently been construed (see, e.g., *People* v. *Morales* (1989) 48 Cal.3d 527, 554-557 [257 Cal.Rptr. 64, 770 P.2d 244]) and amended (initiative measure (Prop. 114), approved, Primary Elec. (June 5, 1990); initiative measure (Prop. 115), approved, Primary Elec. (June 5, 1990)), has become problematic. Whether it now contravenes the Eighth Amendment in its definition of death-eligibility is a question I need not and do not reach.

Appellant's petition for a rehearing was denied February 16, 1995, and the opinion was modified to read as printed above.

---

[18]We also note that defendant filed a petition for writ of habeas corpus, contending that defense counsel rendered ineffective assistance of counsel throughout the proceedings, that juror misconduct occurred, that the jurors improperly considered defendant's shackling during the trial (undermining the reliability of the verdicts reached at the conclusion of the guilt and penalty phases of the trial), and that the prosecutor's decision to seek the death penalty was discriminatory. That petition was denied on October 14, 1994. (*In re Crittenden*, S034783.)